No. 48,585

NORTH CENTRAL KANSAS PRODUCTION CREDIT ASSOCIATION, *Appellee,*
v. WASHINGTON SALES COMPANY, INC., AND HARTFORD ACCIDENT
AND INDEMNITY COMPANY OF HARTFORD, CONNECTICUT, *Appellants,* v. DENNETH UFFMAN, *Third Party Defendant.*

(577 P.2d 35)

Opinion filed April 1, 1978.

*C. Stanley Nelson,* of Hampton, Royce, Engleman & Nelson, of Salina, argued the cause, and was on the brief for appellants. *Gerald Sawatzky* and *James D. Oliver,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, were on the brief *amici curiae* for Glasco Livestock Exchange, Inc., Osborne Livestock Commission, Inc., and Lowell Darcey, d/b/a Belleville Livestock Commission Co.; *Edward W. Rothe* and *James T. Malysiak,* of Freeman, Rothe, Freeman & Salzman, of Chicago, Illinois, and *Gerald J. Letourneau,* of Colmery, McClure, Funk, Letourneau & Entz, of Topeka, were on the brief *amicus curiae* for Iowa Beef Processors, Inc.; and *Stephen T. Phelps* and *John K. Pearson,* of Wichita, were on the brief *amicus curiae* for Federal Intermediate Credit Bank of Wichita; and *Charles N. Henson* and *Anne E. Lolley,* of Eidson, Lewis, Porter & Haynes, of Topeka, were on the brief *amicus curiae* for the Kansas Bankers Association.

*Don W. Noah,* of Noah & Harrison, P.A., of Beloit, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by the defendant, Washington

Sales Company, Inc. (Washington), and the surety on its bond, Hartford Accident and Indemnity Company, from a directed verdict granted in favor of the plaintiff, North Central Kansas Production Credit Association (PCA), in an action for conversion brought by PCA to enforce its perfected security interest in cattle sold by the debtor, Denneth Uffman, through Washington's livestock auction sales barn. The principal question presented here is whether PCA authorized these sales of cattle by the specific language of the security agreements or by its course of dealing with Uffman.

The principal facts are not disputed. PCA loaned Denneth Uffman more than one hundred thousand dollars on March 2, 1972. Uffman executed a promissory note, a security agreement, and a financing statement to PCA on that date. The financing statement was promptly filed with the register of deeds of Washington County, Kansas, on March 8, 1972.

The security agreement specifically covers 80 Holstein cows of various ages, 1 Holstein bull, 20 Holstein calves of various weights, 5 Angus cows, and 5 Angus calves, together with all property similar to that listed which may at any time be acquired by the debtor, including all natural increase thereof, all milk produced by any cows, and various other property. The security agreement provides that:

"(5) The Debtor . . . will not . . . dispose of [the property herein described] without the written consent of the Secured Party; however, permission is granted for the Debtor to sell the property described herein for the fair market value thereof, *providing that payment for the same is made jointly to the Debtor and to the Secured Party* . . . ." (Emphasis supplied.)

The financing statement, signed by Uffman, described "livestock of every kind and description whether or not marked or branded," and specifically provided that: "Proceeds of Collateral are also covered."

A few months later, Uffman applied to PCA for an additional loan. He executed a second security agreement, the terms of which are similar to those in the initial security agreement, and since they raise no additional questions, need not be detailed here.

Both PCA and Uffman intended that Uffman should sell milk regularly during the course of the loan, that he would sell wheat, and that from time to time he would cull cows from his dairy herd

and sell them, together with calves. The milk, wheat, cows and calves were all included as collateral under the terms of the security agreements and financing statement; payment, upon sales of those items, was, under the terms of the security agreement, to be "made jointly to the Debtor [Uffman] and to the Secured Party [PCA]." The provision covering *all milk produced by any cows* was part of the printed security agreement. PCA's president testified, however, that: "We do not claim a security interest in the milk payment proceeds . . .," and that the security agreement covered only the *milk base.*

Uffman sold wheat at a local elevator twice. In each instance the elevator issued checks made payable to Uffman. Uffman deposited one check from the elevator in his personal checking account, then wrote a personal check to PCA; he endorsed the other elevator check directly to PCA.

Uffman sold his milk to AMPI. PCA knew that Uffman had already made an assignment of $300 per month to FHA from his milk checks, and had filed that assignment with AMPI. PCA did not feel that AMPI would honor a second assignment, and none was requested. AMPI sent the milk checks directly to Uffman, payable to him only, and he endorsed them over to PCA until December, at which time PCA called Uffman's loan, for reasons not important now. Thereafter, and although PCA protested, Uffman retained the milk checks. PCA did not admonish Uffman when it learned that he had sold wheat and was selling milk, and taking payment in his name only, in violation of the express terms of the security agreement.

It takes a number of consecutive years of production and sale of milk to acquire what is known in the industry as a *milk base.* Uffman never acquired one.

On March 15, 1972, only 13 days after the loan was made, Uffman first sold cattle which were collateral for the loan. Thereafter, and through March 28, 1973, he sold a total of 35 head of cattle through Washington on ten separate occasions. The total sale proceeds amounted to $7,563.65. Uffman did not report those sales to PCA, and did not remit the proceeds. Washington had no actual knowledge of the loan, the financing statement, or the security agreements. Edwin Burt, president and manager of Washington, testified in substance that he had no knowledge of PCA's lien, and that he was never advised that the cattle were

mortgaged or subject to the security agreement. He was aware that financing statements on livestock were recorded with the register of deeds in the county where the owner lives, but he never checked the records on anyone who sold livestock at his sales barn. PCA had no knowledge of these cattle sales until sometime in April, 1973.

The trial judge's decision reads in pertinent part as follows:

"The primary issue is whether the plaintiff waived its security interest in the cattle by consenting to the sale by the provision of its security agreement.

"While there appears to be a division of authority on this question, and the Kansas Supreme Court appears not to have ruled on it, it appears to the Court that the purpose and intent of the Uniform Commercial Code is best served by the reasoning of the cases holding that the secured party did not waive its security interest in the cattle by the provision quoted from the security agreement.

"While a sale by a debtor cuts off a security interest in the collateral if the secured party has authorized the debtor's actions in the security agreement or otherwise, the plaintiff did not waive its security interest by consenting to the sale of the cattle in return for drafts of the buyer payable to the plaintiff. Nothing in the Uniform Commercial Code prevents a secured party from attaching conditions or limitations to its consent to sales of collateral by a debtor. If such conditions are imposed, a sale by the debtor in violation of those conditions is an unauthorized sale and the security interest continues.

"Nor can we find a waiver in the course of dealings between the plaintiff and Uffman. As long as the checks for wheat and milk were turned over to plaintiff, it had no reason to object and the conduct is entirely consistent with the conditional consent to sell.

"The Court follows the rationale of Baker Production Credit Ass'n v. Long Creek Meat Co., 513 P.2d 1129, an Oregon case; and Garden City Production Credit Ass'n v. Lannan, 186 Nebraska 668."

We turn first to the following provisions of the Uniform Commercial Code, each of which has application to the dispute before us:

K.S.A. 84-1-205 (4). "The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

K.S.A. 84-9-306 (2). "Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor." (This section has been slightly altered and presently appears as K.S.A. 1977 Supp. 84-9-306 [2]; modifications enacted in 1975 do not effect the impact of the original section, which is before us here.)

K.S.A. 1972 Supp. 84-9-307. "A buyer in ordinary course of business (subsection [9] of section 84-1-201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the buyer knows of its existence. For purposes of this section only, 'farm products' does not include milk, cream and eggs." (Now K.S.A. 1977 Supp. 84-9-307 [1].)

Before examining the issues in detail, we pause to note that we deal here with a controversy between a lender and a third party, neither of whom had *actual* knowledge of the dealings of the other with the debtor. Washington had *constructive* notice of PCA's interest in the cattle by virtue of the recorded financing statement. No claim of estoppel is before us, since there was no reliance by Washington upon the acts of PCA, and so far as the record indicates, there was no contact between PCA and Washington, with reference to the matters here at issue, until after the last cattle sales by Uffman.

The first issue is whether the specific terms of the security agreement, authorizing Uffman to sell collateral (1) with the prior written consent of PCA, or (2) with payment for the collateral being made jointly to Uffman and PCA, constitute a waiver of the security interest or a consent to the sales made through Washington.

In *Baker Prod. Credit v. Long Cr. Meat,* 266 Ore. 643, 513 P.2d 1129 (1973), the court said:

"If the consent or authorization to sell is unconditional, . . . then clearly the purchaser takes free of the security interest. We have found no cases decided under the Code which deal with conditional consents. There is nothing in the Code, however, to prevent a secured party from attaching conditions or limitations to its consent to sales of collateral by a debtor. If such conditions are imposed, then a sale by the debtor in violation of those conditions is an unauthorized sale and the security interest, under ORS 79.3060 (2), continues in the collateral.

"The purchaser, of course, can protect himself by ascertaining whether a security interest exists and by requiring that he be furnished with proof of the secured party's consent. In this way he can learn whether there are any conditions attached to the consent which could prevent him from taking free of the security interest." (p. 654.)

We likewise know of no provision in the UCC as enacted in this state, and none have been cited, which prevents a secured party from authorizing a sale of collateral by the debtor under specific conditions. We conclude that the provisions before us are not violative of the code and do not effect either a waiver of the

security interest or a consent to sale in violation of the stated terms.

The next issue is whether PCA impliedly consented to the sales of the livestock by Uffman, and impliedly waived its security interest, by its course of conduct in allowing Uffman to sell wheat and milk in his own name, receive payment therefor, and remit the proceeds to PCA, without admonishing him for violating the security agreement. There were but two sales of wheat; Uffman remitted promptly on both occasions. PCA, therefore, had no reason to complain. The proceeds from the sale of milk were regularly paid to Uffman; he remitted those proceeds to PCA from the inception of the loan until December, 1972. PCA, however, did not in fact claim a security interest in these milk checks; this is clear from the cited testimony of PCA's president. PCA contended that it had a claim only upon the *milk base,* which was never realized.

We have carefully examined the cases and authorities cited by industrious counsel in the original briefs and those *amicus curiae* (all of whose briefs were most helpful), as well as others which our research uncovered. The division of authority is sharp. Some cases support the rationale of *Clovis National Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967); others—and most writers on the subject—follow *Garden City Production Credit Assn. v. Lannan,* 186 Neb. 668, 186 N.W.2d 99 (1971).

In *Clovis,* the bank held a security interest in cattle belonging to one Bunch. Bunch twice sold cattle which were covered by the security agreement, deposited the proceeds with the bank, and had all or a greater portion of that amount applied upon the loan. A later and much larger sale of cattle was made by Bunch through the defendant commission company, without the bank's knowledge or consent. The proceeds from that sale were not remitted to the bank. There was also some evidence to show that the bank permitted other debtors to sell cattle and remit directly to the bank. Upon this record, the *Clovis* court held that the bank, by common practice, custom, usage, and procedure, had acquiesced in and consented to the sale, and that it had waived its security interest. Shortly thereafter, the New Mexico legislature repudiated the *Clovis* doctrine by adding the following sentence to 9-306 (2):

"50A-9-306 (2), N.M.S.A. 1975 . . . A security interest in farm products

and the proceeds thereof shall not be considered waived by the secured party by any course of dealing between the parties or by any trade usage."

The facts in *Lannan* are somewhat similar. Garden City PCA held a security interest in the cattle of one Carter. On several occasions, Carter sold cattle and endorsed the drafts over to Garden City, to be applied upon Carter's indebtedness. Later Carter arranged a large cattle sale. The purchaser, Western, gave Carter a small draft in part payment. Carter endorsed it over to Garden City. The draft included a notation that it was given as part payment for 165 head of cattle. Garden City therefore had knowledge of the intended sale. The second sight draft, for the major portion of the purchase price, was dishonored, and was returned for insufficient funds. Western, meanwhile, sold the cattle to defendant Lannan. Garden City PCA then brought action against Lannan to enforce its security agreement. The *Lannan* court said:

"There is no evidence in the record to support the defendant's allegation in his amended answer that P.C.A. had orally or in writing waived its security interest under the terms of the financing agreement. In essence, then, the defense to this action, in violation of the express terms of the security financing agreement, is based on the doctrine of implied consent or authorization (§ 9-306(2), U.C.C.) flowing from P.C.A.'s acknowledgement of the sale, and its failure to rebuke or object and require compliance with the express terms of the agreement when it accepted and applied the proceeds of the sale on the loan.

"The evidence reveals a typical farm-ranch operation contemplating a course of dealing in the sale of farm products, and the necessity of securing credit financing for such an operation. The Uniform Commercial Code, whatever else its objects may be, was designed to close the gap in the classic conflict between the lender and the innocent purchaser and furnish acceptable, certain, and suitable standards which would promote the necessity of and the fluidity of farm credit financing in the modern context, and at the same time facilitate the sale and exchange of collateral by furnishing a definable and ascertainable standard which purchasers could rely on. . . .

". . . It is uncontested in the present case that there was strict compliance with the filing and notice provisions of the code. Lannan, the purchaser, was bound by the provisions of the code and must ordinarily take the risk of a failure to make the appropriate investigation contemplated by its provisions.

"In this case we have a coupling of a provision prohibiting disposition of the collateral without written consent, together with a reservation of a security interest in the proceeds of any sale. These provisions cannot be construed otherwise than a further protection for the security holder under the terms of the code, and cannot be construed as provisions which open up the door to an expanded permissiveness or consent to the borrower, or a purchaser bound by the filing and notice provisions of the code. See Overland Nat. Bank v. Aurora Coop. Elevator Co., *supra*.

"Lannan, defendant here, must necessarily rely upon a previous course of dealing between the lender and the debtor, amounting to nothing more than a failure to object or rebuke the debtor for selling without written consent. At the same time P.C.A. was entitled to rely upon its agreement and the provisions of the code giving it a continuing perfected security interest in the identifiable proceeds of the sale. Considering the realities involved in accomplishing a simultaneous exchange of property for money, we can find nothing in P.C.A.'s choice of alternatives in its previous course of dealing from which an inference could be drawn that it had waived its security agreement or that Lannan was entitled to ignore the provisions of the code because of a private and undisclosed arrangement or course of dealing between the debtor and the lender alone. It must be borne in mind that in this case we are dealing with a controversy between the lender and a third party purchaser who had no knowledge of the course of dealing between the debtor and borrower. We are not called upon here to resolve a controversy between the lender and the debtor in which such agreement or arrangement or course of dealing might be relevant to the enforcement of a security interest against the debtor's property.

"We are aware that section 1-205, U.C.C., provides that a course of dealing which by previous conduct between the parties, may alter an agreement by fact recognition. But, as we have said, we fail to see how a failure to rebuke or object contemporaneous with a delivery by the debtor and acceptance of the proceeds to which the security agreement attaches, can be construed as a voluntary and intelligent waiver by the lender of its right under a perfected security agreement against a third party purchaser, and this is particularly true when the security agreement itself provides a specific means for obtaining such waiver." (pp. 671-674.)

The *Clovis* decision, as we pointed out earlier, is no longer applicable in the jurisdiction where it was adopted. Be that as it may, we do not think its rationale follows the intent of the framers of the Uniform Commercial Code, particularly as expressed in the sections of the code set forth above. We conclude that a ruling, following the *Clovis* doctrine, would hinder "the granting of credit to the capital-intensive agricultural industry" in this state; that such a holding is not in the spirit of the UCC, is not required by its terms, and would not be in the public interest. We therefore follow the rationale of *Lannan,* supra, and find no waiver of a security interest, and no consent to the sales here involved, by PCA's failure to remonstrate with Uffman, following his sales of milk and wheat.

Certainly there was no waiver as that term is generally understood in contract law. Waiver generally implies "that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction

which is inconsistent with the contractual right." *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.,* 221 Kan. 523, 526, 561 P.2d 792 (1977), quoting from *Proctor Trust Co. v. Neihart,* 130 Kan. 698, 705, 288 Pac. 574 (1930). The action of PCA, in accepting payment for the isolated wheat sales, and the milk (in which it claimed no security interest) can hardly be construed as a voluntary and intentional renouncement of its interest in all of the collateral included in the Uffman security agreement.

We also conclude that the equitable doctrine of waiver should not be utilized in favor of one who has constructive notice of a lien, and admittedly has been remiss in checking public records maintained, at least in part, for his protection.

While we hold that PCA did not, by the terms of its security agreement, or by its conduct recited above, expressly or impliedly waive its security interest in the collateral, we are faced with a far more serious question: Did PCA, through its officers, *expressly* consent to the sale of collateral by Uffman, with payment to Uffman? We think it did. PCA's president, James D. Ganson, was called as a witness on behalf of the plaintiff. On direct examination, he testified as follows:

"Q. Did you, Mr. Ganson, ever have any conversation at all with Mr. Uffman regarding his not selling cattle?

"A. We told him he could sell cattle providing he applied the proceeds from that sale or had the check made jointly.

"Q. When was he told that, sir?

"A. He was told at the beginning of the loan when Mr. Rightmeier was out there, and I can remember visiting with him in that regard on one of my visits out there."

In other words, Uffman was told by the president of the lending association that he could sell cattle "providing he applied the proceeds from that sale." Thus, Uffman was specifically authorized to sell cattle, and he was entrusted to apply the proceeds. The direction to him, by Ganson, was in the alternative; Uffman could apply the proceeds himself, *or* he could have the check made jointly.

The basis of PCA's claim against Washington is conversion—the exercising of unauthorized control over property. When the debtor was given the right to sell collateral and to collect the money, the sale barn, as his agent, acquired that same right. Since PCA expressly consented to a sale by Uffman with payment to

Uffman, we hold that PCA's cause of action against Washington, for conversion, must fail.

In *DeVore v. McClure Livestock Commission Co., Inc.,* 207 Kan. 499, 485 P.2d 1013 (1971), an action for conversion against a cattle sales barn, we said:

". . . [W]e start with the common law rule that a factor or commission merchant who receives property from his principal, sells it under the latter's instructions and pays him the proceeds of the sale, is guilty of a conversion if his principal had no title thereto or right to sell the property, and generally the factor may not escape liability to the true owner for the value of the property by asserting he acted in good faith and in ignorance of his principal's want of title . . . . The basis for the factor's liability if he assists in a conversion, even though innocent, is the fact he stands in the shoes of his principal . . . ." (p. 503.)

In *DeVore,* Young and DeVore were joint venturers; Young was clothed with full indicia of title, and was directed by DeVore to sell the hogs through the defendant livestock commission. We there held that the livestock commission could not be held guilty of conversion if the one joint adventurer failed, after receiving the proceeds from the commission company, to account to his co-venturer for his share of the proceeds.

Likewise, in the case at hand, Uffman was specifically authorized to sell the cattle and receive the proceeds. Washington, derivatively, was authorized to sell the livestock and make payment to Uffman. Under the peculiar and specific facts of this case, we conclude that there was no conversion.

Washington has raised one further point. It contends that PCA benefited from the receipts from the sale of the cattle because those proceeds were used for the maintenance and operations of Uffman's dairy farm and equipment. The trial judge concluded that this contention was wholly unsupported by the evidence. We agree. The proceeds were deposited in Uffman's personal bank account, from which he paid living and other expenses. There is nothing in the evidence to support a finding that PCA benefited from those funds. Further, the point is moot in view of our disposition of this case.

For the reasons above stated, the judgment of the district court is reversed with directions to enter judgment for defendant.