(577 P.2d 824)
No. 49,077

NORTH CENTRAL KANSAS PRODUCTION CREDIT ASSOCIATION, *Plaintiff-Appellant,* v. GALEN H. BOESE and MARY ANN BOESE, *Defendants,* and IOWA BEEF PROCESSORS, INC., *Defendant-Appellee.*

Affirmed by Supreme Court in unpublished opinion, December 9, 1978.

Opinion filed April 28, 1978.

*Don W. Noah* of Noah & Harrison, P. A., of Beloit, for appellant.

*James T. Malysiak* of Freeman, Rothe, Freeman & Salzman, of Chicago, Illinois, for appellee.

Before REES, P.J., SWINEHART and MEYER, JJ.

MEYER, J.: This is an action for conversion brought by a secured creditor, the North Central Kansas Production Credit Association (PCA), against Iowa Beef Processors, Inc. (IBP), the purchaser of livestock in which PCA had a perfected security interest, and the sellers of the livestock, Galen and Mary Boese. The trial court entered judgment in favor of the defendant, IBP, on its motion for summary judgment and PCA has appealed. At the same time, the trial court entered judgment against Galen and Mary Boese on PCA's motion for summary judgment against them. No appeal has been taken from the judgment against the Boeses.

The material facts are as follows:

Boese sold cattle in which PCA had security interests on the following occasions:

| Date | No. of Head | Purchase Price |
| --- | --- | --- |
| 1. December 3, 1973 | 20 cows | $ 7,750.00 |
| 2. January 23, 1974 | 18 heifers | 7,600.00 |
| 3. February 19, 1974 | 34 steers | 17,541.74 |

| | | |
|---|---|---|
| 4. March 17, 1974 | 60 heifers * | 23,568.85 |
| | 2 steers | 869.90 |
| 5. July 10, 1974 | 94 heifers | 36,429.16 |

*The number of cattle in this sale is variously referred to in the record as numbering from 62 to 67.

The separate checks for the first three sales were all made payable to Boese only and were either deposited in his personal checking account and a check issued to PCA for the sale or they were endorsed by Boese to PCA.

On March 19, 1974, PCA's vice president, Darwin Householder, inspected Boese's feeding operation and noted a shortage of cattle. Boese consequently advised PCA of the March 17, 1974, sales (which were to IBP), adding that he had not yet been paid. Householder told Boese to mail or deliver "a check for the proceeds of the 67 head of cattle. . . ." Although Boese never did deliver payment, PCA took no further action until June of 1974.

On March 21, 1974, Boese endorsed and cashed both March 17 transaction checks, but did not remit the proceeds to PCA.

In late June of 1974, Householder made an informal visit to Boese's, discovered fewer cattle than PCA thought there should be, and called Boese to meet with him at PCA's Mankato office.

On July 1, 1974, at Mankato, Householder and James D. Ganson (PCA's president) confronted Boese with the cattle count discrepancy. Boese initially denied the discrepancy, but then admitted that he had sold some cattle without forwarding the proceeds to PCA (PCA, of course, already knew this because they had not received the proceeds of the March 17 sale). Boese told PCA he had used the proceeds to cover losses in grain speculation.

On July 3, 1974, Ganson and Householder inspected Boese's operation and counted his cattle. They told Boese that he could determine when the cattle were ready to be sold and could make the sale.

Householder visited Boese's feedlot again on July 8, 1974. Boese told Householder that a prospective buyer for the larger cattle was coming that night, but if the buyer did not offer what Boese considered a fair price, he would show the cattle to other buyers.

On July 10, 1974, Boese sold IBP 94 heifers for a net purchase price of $36,429.16. IBP issued its check payable to Galen H. Boese. Boese took this check to the Fremont Casino in Las Vegas,

Nevada, cashed it, and lost virtually all of it. In a federal court action to determine ownership of the check (as among IBP, PCA, and the Fremont Casino), the court awarded the check to the Fremont Casino.

In response to IBP's request for admissions concerning PCA's practice of letting the buyer sell cattle and handle the proceeds, PCA replied:

"Admit that on two occasions one other PCA borrower sold cattle, but failed to turn over the proceeds to PCA; but PCA did not change its custom of allowing its borrowers to sell cattle without prior express permission, relying on them to turn over the proceeds to apply against their debts either by endorsing the purchaser's check over to PCA or by depositing the proceeds in their personal bank accounts and issuing checks to PCA."

We have fully considered *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967) and *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971); together with *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co.*, 223 Kan. 689, 577 P.2d 35 (1978). We note that in the latter case, the court followed the rationale of the *Lannan* case.

It appears to us that neither PCA nor IBP followed proper business standards. On one hand, PCA permitted grossly improper conduct on the part of its debtor. Although PCA knew, or should have known, that the debtor was not remitting proceeds to them (specifically from the March 17 sale), they waited months before doing anything about it. Even then, they did nothing to change the situation. Had PCA taken corrective action then, a major part of this litigation would have been avoided.

On the other hand, IBP, while attempting to invoke equitable relief, was also guilty of using careless business methods. They had the temerity to argue before the district court that they were too large a business to be bothered with checking security agreement records every time they made a purchase. The trial court summarily rejected their argument, and we agree.

We feel that the equity stance of the parties is comparable, and that equity should not come to the aid of either.

In line with what has been decided by the Kansas Supreme Court in *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co.*, supra, it is important to distinguish between the March 17 and July 10 cattle sales.

As to the March 17 sale, the record reflects that on March 19, 1974, before Boese had received the proceeds of the sale, a conversation occurred between Ganson and Boese. Ganson told Boese to mail or deliver "a check for the proceeds of the 67 head of cattle." Ganson's instructions had to be premised upon his knowledge that the check would be sent to Boese and made payable to Boese only. Had PCA thought the check would be payable to PCA and Boese jointly, the instructions would have been unnecessary. Boese alone could not cash a joint check. Thus, PCA's statement to send "a check" is tantamount to their expressly consenting to Boese's receiving the check in his own name. Ganson's directive was an express waiver—an express consent—as to the March 17, 1974, transaction. We conclude that PCA, through its officers, *expressly* consented to Boese's selling the cattle and accepting payment; therefore, that transaction falls directly within the purview of *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co.,* supra.

The July 10 sale presents a different set of circumstances. In that sale, as the following questions and answers from Householder's deposition reveal, PCA expressly demanded that all future checks be made jointly payable:

"Q. Was there any discussion about how he would handle the sale of the cattle?
A. Yes, sir.
Q. What was that discussion?
A. We told him very definitely that any cattle that were sold should be made jointly to he and to the association.
Q. How did you put it to him as best as you can recall?
A. As best as I recall, I said that in all *future* cattle circumstances, the check must be made jointly to you and to the North Central Kansas Production Credit Association. [Emphasis added.]
Q. And you said that rather than Mr. Ganson?
A. I think we both said it.
Q. Did Mr. Ganson say it the same way you said it?
A. Yes, sir."

Again on July 1, 1974, after PCA knew that Boese had lost the March 17 proceeds on grain futures rather than remitting to PCA, the following conversation between Ganson and Boese occurred:

"Q. Did you discuss with him at that time what he should have done?
A. No, sir, we discussed with him the only way that we would continue on this basis, and that would be on the basis of feeding the cattle; and that would be with

complete cooperation, and when the cattle were sold that the check had to be made jointly.

Q. What do you mean by complete cooperation?

A. That he would take care of the cattle and see that they were fed and to get the best possible gain out of them as possible; and then as I say, whenever the cattle were sold the check would be made jointly."

Under authority of *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co.,* supra, we find that the decision of the district court should be affirmed insofar as it relates to the March 17, 1974, sale of cattle. Under authority of the same case, the judgment of the district court must be reversed as to the proceeds of the July, 1974, sale.

Affirmed in part. Reversed in part.