**BENSON COUNTY COOPERATIVE CREDIT UNION,**
**Plaintiff/Appellee,**

v.

**CENTRAL LIVESTOCK ASSOCIATION, INC., Defendant/Appellant.**

**Civ. No. 9818.**

Supreme Court of North Dakota.

Nov. 21, 1980.

Nilles, Hansen, Selbo, Magill & Davies, Fargo, for defendant/appellant; argued by W. Todd Haggart, Fargo.

Lamb, Schaefer, McNair & Larson, Fargo, for plaintiff/appellee; argued by Michael D. McNair, Moorhead, Minn.

PAULSON, Justice.

Central Livestock Association, Inc. [hereinafter "Central Livestock"] appeals from a summary judgment entered by the Cass County District Court on March 12, 1980. We reverse the judgment of the district court and remand the case for trial.

Lyla Hagen and her mother, Hazel Hagen [hereinafter "Lyla" or "Hazel"], conducted a hog–raising operation near Maddock. On February 9, 1976, Lyla applied for a $24,000.00 loan from the Benson County Cooperative Credit Union [hereinafter "Credit Union"]. The Credit Union approved her application and loaned Lyla $24,-000.00 on February 10, 1976. Lyla, as borrower and maker, executed a note to the Credit Union for $24,000.00. The note was to be repaid in ten annual installments of $2,400.00 each plus interest. The first payment was due on December 10, 1976. The loan was made to allow Lyla to purchase hogs and feed for the hogs. On February 10, 1976, Lyla also executed a security agreement which listed the Credit Union as the secured party. The schedule of property covered by the security agreement included 50 sows; 185 feeder pigs; and a 1962 D–14 Allis Chalmers Tractor with Dual Loader. Lyla warranted that the collateral for the loan was used for business operations. The security agreement signed by Lyla contained a clause which provided that no part of the property subject to the security agreement was to be sold by the debtor without the written consent of the Credit Union. On February 14, 1975, at 8:50 a. m., a financing statement was executed by Lyla and Hazel and was filed with the Benson County Register of Deeds by the Credit Union. The financial statement covered the proceeds of collateral as well as the products of collateral. The collateral was described as a 1962 D–14 Allis Chalmers Tractor with Dual Loader; 45 sows; and 185 feeder pigs.

Because of low hog prices and high feed prices, Lyla was unable to make the first payment due under the note. Accordingly,

she entered into an extension agreement with the Credit Union on December 15, 1976. A few months later, Lyla prepared and submitted a personal financial statement which she signed in her individual capacity. The security agreement signed by Lyla was also signed in her individual capacity. However, the financing statement was executed by both Lyla Hagen and Hazel Hagen. The financing statement was prepared and filed before the Credit Union's loan to Lyla on February 10, 1976, and the financing statement did not refer to the loan. Following the execution of the February 10, 1976, security agreement, Lyla made shipments of hogs to Central Livestock for sale of the hogs on her account. The net proceeds of these sales were remitted to Lyla but Lyla failed to apply the proceeds of the sales to the amount due under the terms of the note. In January of 1978, Lyla informed the Credit Union that the hogs had been sold and that Lyla and Hazel were filing for bankruptcy. The manager of the Credit Union knew that Lyla was raising hogs and selling them prior to the execution of the December 15, 1976, extension agreement. Although Lyla had sold some of the hogs subject to the Credit Union's claimed security interest, the Credit Union was primarily concerned with receiving its annual payments and did not insist that its consent be obtained before further sales took place.

The Credit Union initiated this action by issuing a complaint on March 20, 1979, which alleged that Central Livestock had purchased property secured by the Credit Union's security agreement and was liable for conversion. The Credit Union claimed that Lyla and Hazel were doing business as a partnership despite the fact that none of the records of sale prepared by Central Livestock reflect joint shipments by Lyla and Hazel or by a purported partnership. Lyla and Hazel were paid by separate checks. The records of sale prepared by Central Livestock reveal that Lyla's gross sales totaled $8,048.38, with net sales of $7,693.44. The amount of gross sales by Hazel through Central Livestock totaled $10,070.30, with net sales of $9,623.99. The

difference between the gross sales and net sales reflects trucking, yardage, feed, sales commissions, and transit insurance expenses incurred by Lyla and Hazel in marketing the hogs. The gross sales of Lyla and Hazel totaled $18,215.50, while the net sales totaled $17,405.63. On October 9, 1979, a hearing was held on the Credit Union's motion for summary judgment. On February 29, 1980, the Cass County District Court held that the Credit Union was entitled to summary judgment in the amount of $18,215.50, plus interest from the date of each sale of hogs, together with costs and disbursements.

In its order allowing the Credit Union's motion for summary judgment, the district court determined that the financing statement covering the identical property listed in the security agreement was filed in the office of the register of deeds on February 14, 1976, instead of February 14, 1975, which is the date listed on the financing statement. The district court determined that the loan was executed by Lyla in a partnership capacity even though the note and the security agreement did not reflect this fact. The district court based its conclusion that Lyla and Hazel were partners on the fact that the financing statement was signed by both Lyla and Hazel. No consent was given either orally or in writing by the Credit Union to the Hagens which would authorize the sale of the hogs. The balance owing on the promissory note is $22,302.17, plus interest. The district court also determined that the Credit Union had not asked Lyla and Hazel about sales of hogs prior to January of 1978, when Lyla informed the Credit Union that all the hogs were sold and that Lyla and Hazel were filing for bankruptcy. The district court also determined that Central Livestock was guilty of converting the hogs to their own use and was liable for the value of the hogs as of the date of the conversion.

Four issues are presented for our consideration. The issues are as follows:

1. Whether or not the district court improperly made findings on genuine issues of material fact in granting the motion for summary judgment;

2. Whether or not the deposition testimony of Gordon Arne, the manager of the Credit Union, creates a genuine issue of material fact as to whether the Credit Union, by its conduct, waived its rights under the security agreement;

3. Whether or not a genuine issue of material fact exists as to the scope of the security interest, *i. e.*, whether it attached to hogs owned by Lyla alone or to hogs owned by Hazel; and

4. Whether or not the district court improperly computed the amount of damages awarded.

Rule 56(c) of the North Dakota Rules of Civil Procedure provides that a party who moves for summary judgment has the burden of clearly showing that there is no genuine issue as to any material fact.

■■■ On appeal from a summary judgment, the evidence must be viewed in the light most favorable to the party against whom the summary judgment was granted. *Winkjer v. Herr*, 277 N.W.2d 579 (N.D. 1979). This court cannot decide disputed issues of material fact; we may only determine whether a genuine issue exists and whether the law was applied correctly. Accordingly, we reverse the grant of a summary judgment motion if it appears from the record that there is an unresolved issue of material fact. Summary judgment is not appropriate if the moving party is not entitled to judgment as a matter of law or if reasonable differences of opinion exist as to the inferences to be drawn from undisputed facts. *Helbling v. Helbling*, 267 N.W.2d 559 (N.D.1978); *Farmers Elevator Co. v. David*, 234 N.W.2d 26 (N.D.1975). Under Rule 56(c), N.D.R.Civ.P., we may consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits in determining whether or not there is a genuine issue of material fact. Only those questions that are within the range of allowable controversy are material.

I.

The first issue raised by Central Livestock concerns whether or not the district court improperly made findings on genuine issues of material fact when it granted the motion for summary judgment. Central Livestock asserts that in the district court's findings, which were labeled "UNDISPUTED FACTS" in the district court's order allowing the motion for summary judgment, the district court made numerous findings which are disputed by Central Livestock. Central Livestock also asserts that the district court failed to view the entire record in the light most favorable to the party opposing the motion. *Pioneer State Bank v. Johnsrud*, 284 N.W.2d 292 (N.D.1979); *Winkjer v. Herr*, 277 N.W.2d 579 (N.D.1979). Central Livestock alludes to as erroneous the district court's conclusion that the financing statement was filed on February 14, 1976, rather than on February 14, 1975. Central Livestock also argues as erroneous the district court's conclusion that Lyla and Hazel operated as a partnership.

The district court's conclusions are not supported by the facts. In regard to the financing statement, the financing statement could have been previously obtained and filed by the Credit Union in connection with another transaction. It is also interesting to note that February 14, the date on which the financing statement was filed, fell on a Saturday in 1976. The Credit Union acknowledges that the district court committed error in assuming that the true date of the financing statement was February 14, 1976, rather than February 14, 1975; however, the Credit Union argues that this error is insignificant in view of § 41–09–41, N.D.C.C., which provides that a financing statement may be filed before a security agreement is made or a security interest otherwise attaches. In order to examine the truth of the Credit Union's assertion, we must examine our law dealing with security agreements and perfection of those interests.

Section 41–09–16, N.D.C.C., provides, in pertinent part:

41–09–16. *"Enforceability of security interest–Proceeds, formal requisites.* 1. . . . a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless all of the following take place:

a. The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and, in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned.

b. Value has been given.

c. The debtor has rights in the collateral.

"2. A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection 1 have taken place unless explicit agreement postpones the time of attaching.

"3. Unless otherwise agreed, a security agreement gives the secured party the rights to proceeds provided by section 41–09–27 . . . . "

It is undisputed that the Credit Union has complied with the provisions of § 41–09–16(1)(a)(b) and (c), N.D.C.C. Thus the Credit Union's security interest has attached and becomes enforceable against Lyla with respect to the collateral listed in the security agreement. Attachment has two consequences. First, the security interest becomes enforceable against the debtor. If the debtor defaults, the secured creditor can foreclose or otherwise realize on the collateral to satisfy his claim. Second, the security interest becomes enforceable against third parties and the secured party, in general, takes his collateral from or to the exclusion of third parties. However, third parties can defeat an attached but unperfected security interest. Perfection of a security interest (filing of a financing statement or taking possession of the collateral,

as appropriate) affords maximum secured creditor protection against third parties. Some security interests are perfected simply upon attachment. Under § 41–09–23, N.D.C.C., the security interest which the Credit Union obtained must be filed to be perfected. In this case, the security interest covered the hogs and the tractor which fall within the definition of goods under § 41–09–05, N.D.C.C. The intrinsic nature of the goods does not classify them; rather, it is the use to which the owner puts the goods, or intends to put them, that determines their classification. Section 41–09–09, N.D.C.C. classifies various types of goods and the hogs and the tractor in the instant case fall within the definition of farm products under § 41–09–09(3), N.D.C.C. Section 41–09–40, N.D.C.C., lists the proper place to file to perfect a security interest. There is no dispute as to the fact that the Credit Union properly filed its financing statement. A dispute centers around the effect of the Credit Union's filing of the financing statement on February 14, 1975, while the security agreement was not executed until February 10, 1976.

Section 41–09–41(1), N.D.C.C., provides that "A financing statement may be filed before a security agreement is made or a security interest otherwise attaches." Section 41–09–42(2), N.D.C.C., provides that a filed financing statement is effective for a period of five years from the date of filing. The effect of the Credit Union's early filing of the financing statement is that the security interest possessed by the Credit Union became perfected at the time the security interest attached to the collateral. § 41–09–24, N.D.C.C. The Official Comment to § 9–402, Uniform Commercial Code (codified as § 41–09–41, N.D.C.C.), states that the section adopted a system of notice filing and what is required to be filed is not the security agreement itself but only a simple notice which may be filed before the security interest attaches or after the security interest attaches. Thus, the Credit Union's security interest was perfected on the date the security interest attached to the collateral (attachment occurred when Lyla

signed the security agreement which contained a description of the collateral and received her loan, the proceeds of which she used to purchase the hogs), unless there was an explicit agreement postponing the time of attachment. Clearly, at the time Lyla sold the hogs to Central Livestock the security interest had attached and was perfected (the latter by virtue of the financing statement which had been filed). Whether or not the date of the filing was February 14, 1975, or February 14, 1976, is immaterial.

Under § 41–09–27(2), N.D.C.C., a security interest continues in collateral despite the sale, exchange, or other disposition of the collateral unless the disposition was authorized by the secured party in the security agreement or otherwise; and also continues in any identifiable proceeds. Under § 41-09–28, N.D.C.C., a buyer in the ordinary course of business other than a person buying farm products from a person engaged in farming operations, takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence. *See, e. g., Southwest Washington Production Credit Ass'n v. Seattle First Nat. Bank,* 92 Wash.2d 30, 593 P.2d 167 (1979). The limitations which the section imposes on the persons who may take free of a security interest apply only to unauthorized sales by the debtor. If the secured party has authorized the sale in the security agreement or otherwise, the buyer takes free without regard to the limitations of the section. It is undisputed that the security agreement did not authorize sale of the hogs without the consent of the Credit Union. However, Central Livestock contends that the Credit Union waived the requirement that it give written consent in order to authorize the sales of the hogs by not objecting to sales of the hogs of which the Credit Union was aware prior to January of 1978.

█ In an action for conversion by a secured party against one who has purchased collateral from the debtor, allegedly in violation of a provision of the security agreement requiring the secured party's written consent to any sale of the collateral by the debtor, it is a valid defense if the secured party is shown to have consented to the sale. Such consent may be shown by implication arising from a course of conduct as well as by express words. The provision of § 41–09·27(2), N.D.C.C., that a security interest will not continue after sale of the collateral if the sale was authorized in the security agreement "or otherwise" must be read in this light. *Central Washington Production Credit Association v. Baker,* 11 Wash.App. 17, 521 P.2d 226 (1974); *United States v. Central Livestock Association, Inc.,* 349 F.Supp. 1033 (D.N.D.1972). *See, also North Cent. Kansas Production Credit Ass'n v. Boese,* 2 Kan.App.2d 231, 577 P.2d 824 (1978), *aff'd by order,* —— Kan. ——, 588 P.2d 491 (1978); *Garden City Production Credit Ass'n v. Lannan,* 186 Neb. 668, 186 N.W.2d 99 (1971). The pre–Code doctrine of implied consent to sale of collateral which resulted in a waiver of rights under the security agreement is modified by § 41-01-15(4), N.D.C.C. The question of whether a sale of collateral is authorized by the secured party is a question of fact that is subject to dispute in the instant case.

█ Central Livestock also urges as erroneous the district court's conclusion that Lyla and Hazel conducted their farming operations as a partnership. The basis for Central Livestock's assertion stems from the fact that the security agreement was signed by Lyla only. Lyla and Hazel signed the financing statement but the financing statement did not make any reference to any purported partnership between Lyla and Hazel. Following the execution of the February 10, 1976, security agreement, Lyla made shipments of hogs to Central Livestock as did Hazel. However, the sales records prepared by Central Livestock reflect that no partnership label was used when the shipments were made by Lyla and Hazel. When Lyla shipped hogs to Central Livestock for sale, she shipped the hogs only in her own name and at no time directed that payment should be made to Lyla and Hazel. Likewise, when Hazel shipped hogs to Central Livestock for sale, she

shipped the hogs in her own name and received payment in her own name. On two occasions—on December 21, 1976, and on May 11, 1977—Hazel and Lyla each shipped hogs to Central Livestock, for which they were paid by separate checks. These instances of separate sales and Lyla's separate signature on the security agreement, as well as the absence of Lyla's and Hazel's depiction of their farming operations as a partnership, do not lend themselves to the conclusion by the district court that Lyla and Hazel conducted their farming operations as a partnership. Section 41–09–41(8), N.D.C.C., provides that a financing statement which substantially complies with the requirements of the section is effective even though it contains minor errors which are not seriously misleading. *See In re Fowler*, 407 F.Supp. 799 (W.D.Okl.1975); White and Summers, Uniform Commercial Code, 2d Edition Hornbook Series § 23.16 (1980). There are substantial grounds for dispute that the financing statement was effective as to Central Livestock concerning Hazel's interest in the hogs.

Despite the above contentions, the Credit Union argues that Rule 56(e), N.D.R.Civ.P., requires that the district court's issuance of the summary judgment be affirmed. Rule 56(e), N.D.R.Civ.P., provides as follows:

### RULE 56—SUMMARY JUDGMENT

*"(e) Form of affidavits—Further testimony—Defense required.* Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. *When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."* [Emphasis added.]

The Credit Union contends that Central Livestock did not respond by affidavits or otherwise set forth specific facts showing that there is a genuine issue for trial in response to the Credit Union's motion for summary judgment. We do not agree with the Credit Union's contention because it is well settled that the party moving for summary judgment has the burden of demonstrating that the Rule 56(c) test—"no genuine issue as to any material fact"—is satisfied and that he is entitled to judgment as a matter of law. Because the burden is on the movant, the evidence presented to the court always is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it. *Pioneer State Bank v. Johnsrud*, 284 N.W.2d 292 (N.D.1979); *Albers v. NoDak Racing Club, Inc.*, 256 N.W.2d 355 (N.D.1977). While Central Livestock did not submit any affidavits in opposition to the motion for summary judgment, Central Livestock submitted briefs and directed the district court's attention to the deposition testimony of Gordon Arne and the transaction documents present in the case. By considering the pleadings, the depositions, and the answers to the interrogatories, we conclude that there are genuine issues of material fact remaining, and, as such, the Credit Union is not entitled to a summary judgment as a matter of law. Genuine issues of material fact remain, particularly as to whether or not Lyla and Hazel conducted their farming operations as a partnership, whether or not Lyla executed the security agreement in her partnership capacity, whether or not the Credit Union expressly waived the requirement of written consent or had impliedly authorized Lyla and Hazel to sell the hogs, and whether or not the financing statement operated to give effective notice to Central Livestock concerning the entire interest of the Credit Union. In

view of our disposition on this issue, consideration of the remaining issues raised by Central Livestock is unnecessary. It was error for the district court to issue the summary judgment; therefore, the summary judgment is vacated and the case is remanded to the Cass County District Court for trial on the issues of fact and on the merits.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.