No. 56,844

Peoples National Bank and Trust, *Appellant*, v. Excel Corporation, *Appellee*.

(695 P.2d 444)

Opinion filed February 20, 1985.

*Winton A. Winter, Jr.*, of Stevens, Brand, Lungstrum, Golden & Winter, of Lawrence , argued the cause and was on the briefs for appellant.

*Todd N. Thompson*, of Barber, Emerson, Six, Springer & Zinn, of Lawrence, argued the cause, and *Fred N. Six*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

Holmes, J.: Peoples National Bank & Trust (PNB) appeals from an order of summary judgment in favor of Excel Corpora-

tion (Excel) granted in an action for conversion of certain livestock in which PNB held a perfected security interest. Excel bought the livestock from PNB's debtor, Larry D. Burkdoll, and contends PNB released its security interest when it expressly consented to the sale by Burkdoll. PNB appeals claiming its consent was merely conditional and did not affect its security interest. The facts are not in dispute.

PNB is a banking corporation doing business in Franklin County, Kansas. On January 9, 1981, PNB extended a $200,000 line of credit to Larry D. Burkdoll for use in his cattle operation near Princeton, Kansas. As security for the initial loan and all future advances, Burkdoll granted PNB a security interest in the livestock he then owned (385 mixed steers in feed lots), or would thereafter acquire. The security agreement, signed by PNB and Burkdoll, was on a standard form and included a printed provision which stated: "The Debtor will not sell, or offer to sell or otherwise transfer or encumber the Collateral or any interest therein without the prior written consent of the Secured Party." A financing statement was filed with the Franklin County Register of Deeds on January 13, 1981, resulting in a perfected security interest in the livestock. Notwithstanding the specific provisions of the security agreement, one of PNB's officers instructed Burkdoll when the loan was first made that he was free to sell the cattle at any time so long as he delivered the proceeds to PNB as payment on the indebtedness.

PNB alleges that at "various times" after January 9, 1981, Excel purchased livestock from Burkdoll and made payment directly to him without requiring any consent from PNB. PNB did not contact Excel or any of its representatives to object to the manner in which these purchases were handled. For its part, Excel does not make it a practice to check public records for liens or interests in cattle being considered for purchase, and Excel's agent handling these purchases from Burkdoll made no such effort. Larry Burkdoll usually deposited the proceeds of the Excel sales in his personal account at PNB although only a portion of the funds were used to reduce his financial obligation to PNB.

Following completion of discovery, Excel filed a motion for summary judgment which was sustained by the trial court. Relying on K.S.A. 84-9-306(2) and our decision in *North Cent. Kan.*

*Prod. Cred. Ass'n v. Washington Sales Co.*, 223 Kan. 689, 577 P.2d 35 (1978) (hereinafter *Washington Sales*), the trial judge determined PNB had no cause of action for conversion because its security interest in the cattle terminated at the time of the transfer to Excel.

"In this case, the secured party (plaintiff) attached conditions to its consent to sale of the cattle by Mr. Burkdoll. However, the sale by Mr. Burkdoll was not in violation of these conditions in this sales transaction. He sold the cattle and received the proceeds in accordance with the consent. He did fail to apply the proceeds on the loan, however, this was a breach of trust, not of the sales conditions.

"In conclusion, it is the judgment of this court that in this case an express authorization by the secured party of the debtor to sell collateral and to receive the proceeds constitutes an express waiver of the security interest in the collateral sold."

The security agreement executed by Burkdoll provided that all transactions under the agreement and the parties to the agreement were to be governed by the Kansas Uniform Commercial Code (UCC). While the general rule is that a buyer in the ordinary course of business takes the goods free of any security interest created by the seller, that rule does not apply to farm products as defined in K.S.A. 84-9-109(3). Livestock is included within the definition of farm products. K.S.A. 84-9-307(1) provides:

"A buyer in ordinary course of business (subsection (9) of section 84-1-201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence. For purposes of this section only, 'farm products' does not include milk, cream and eggs."

However, the exception created by that section of the UCC is subject to K.S.A. 84-9-306(2) which provides, in part:

"[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." (Emphasis added.)

PNB contends that its consent that Burkdoll could sell the cattle without obtaining the prior written consent of PNB was only a conditional consent dependent upon immediate delivery of the proceeds to PNB to apply upon the debt and did not

constitute an "authorized disposition" affecting its security interest. Excel, on the other hand, takes the position that the consent constituted an authorized disposition as contemplated by the statute, which released it from any liability under the security agreement. Both parties rely upon our decision in *Washington Sales*.

In *Washington Sales* we were confronted with the question of whether North Central Kansas Production Credit Association (PCA), the secured creditor, had authorized sales of cattle by the specific language of its security agreements or by its course of dealing with the debtor. PCA loaned Uffman, the debtor, more than $120,000 in early 1972. The security agreement covered 111 cows, calves and bulls. It also forbade Uffman from disposing of the collateral without PCA's written consent, but went on to grant the debtor permission to sell the property for fair market value *"providing that payment for the same is made jointly to the Debtor and to the Secured Party." Washington Sales*, 223 Kan. at 690 (emphasis supplied by court). Shortly after receiving the loan, Uffman began selling a total of thirty-five head of cattle on ten separate occasions for a total of $7,563.65. He did not report these sales to PCA, nor did he remit the proceeds. Washington Sales Company, Inc., handled the sales of the cattle through its livestock auction sales barn, but had no actual knowledge of the loan, the financing statement or the security agreements. Washington's president and manager was aware financing statements on livestock were matters of public record, but he did not check the records on anyone who sold livestock at his sales barn. When PCA became aware of the sales it sued Washington Sales Company for conversion. The trial court directed a verdict for plaintiff, finding PCA did not by its conditional consent waive its security interest, because the debtor's sale in violation of those conditions was unauthorized. Washington Sales Company and its surety appealed.

The first issue raised was whether PCA waived its security interest, or consented to the sales made through Washington Sales Company because of the specific terms of the security agreement authorizing Uffman to sell collateral either with PCA's prior written consent, or with payment for the collateral made jointly to Uffman and PCA. The court found those provisions constituted neither waiver nor consent because there is no

provision in the Kansas version of the Uniform Commercial Code which prevents a secured party from authorizing a sale of collateral by the debtor under specific conditions. It was also argued that PCA had impliedly consented to the livestock sales and impliedly waived its security interest in the livestock by its course of conduct in allowing the debtor to sell wheat and milk without compliance with the security agreement and by its acceptance of the proceeds of such sales without admonishing Uffman.

Rejecting all arguments of *implied* consent, the court went on to conclude PCA, through its officers, *expressly* consented to Uffman's sale of collateral, with payment to him. There, as here, a bank officer testified he orally told the debtor, at the beginning of the loan, "he could sell cattle providing he applied the proceeds from that sale or had the check made jointly." *Washington Sales*, 223 Kan. at 697. The court concluded this was specific authorization to sell the cattle, under which Uffman was entrusted to apply the proceeds. We held:

"An express authorization by the secured party of the debtor to sell collateral and to receive the proceeds constitutes an express waiver of the security interest in the collateral sold." Syl. ¶ 3.

PNB and Excel seize upon different portions of the *Washington Sales* opinion to support their positions in the present case. PNB relies on our statement that a sale by a debtor in violation of conditions a creditor imposes on its consent is an unauthorized sale, and the security interest in the collateral continues. Excel responds that language in the opinion was limited to the issue of whether the specific terms of the security agreement *alone* constituted waiver. It points out that in *Washington Sales* there was, in addition, a pattern of conduct and express oral statements by the creditor allowing the sale, which is reflected in the finding of *express* consent cutting off the security interest. Excel argues that similar conduct and language is evidenced by PNB in this case, operating to terminate its security interest in the same manner. PNB claims, however, that *Washington Sales* is factually distinct from this case in that it concerned only a claim against the debtor's agent, and was decided purely as a matter of agency, rather than commercial, law.

Other cases, some in reliance upon the different aspects of our decision in *Washington Sales*, have reached conclusions con-

tended for by both litigants in this action. The same lender as in *Washington Sales* appeared before the Court of Appeals in similar circumstances in *North Cent. Kan. Prod. Cred. Ass'n v. Boese*, 2 Kan. App. 2d 231, 577 P.2d 824 (1978). *Boese* was an action for conversion brought against the debtors and the purchasers of the collateral in which PCA had a perfected security interest. Again, PCA customarily allowed the Boeses to sell cattle without prior express permission, relying on them to pay over the proceeds to apply against their debts. This was done on the first three sales but on the fourth sale Boese did not remit. As to these transactions, relying on *Washington Sales,* the court found PCA had expressly consented thereto by instructing Boese to mail or deliver "a check for the proceeds . . . ." Boese could not cash a joint check, and the court determined this statement was "tantamount to their expressly consenting to Boese's receiving the check in his own name." However, that consent did not apply to all the sales. After learning of the fourth sale in which there was no remittance of the proceeds, PCA insisted all future checks be jointly payable. Those instructions were not followed, and in a fifth sale Boese collected $34,429.16 and squandered the proceeds in a Las Vegas casino. Again relying on *Washington Sales,* the court found PCA's modified instructions requiring joint payment negated its earlier consent, and was sufficient to maintain its security interest in the collateral.

Faced with the issue whether a creditor's conditional consent authorizes a sale of farm products and thereby waives its security interest therein, a number of courts have found the security interest continues, permitting recovery by the creditor. Two cases provide plaintiff here unequivocal support for its position. In *Production Credit v. Sea-First,* 92 Wash. 2d 30, 593 P.2d 167 (1979), the security agreement prohibited sale of collateral without the prior written consent of the creditor, but that clause was never enforced, and the creditor permitted sale of farm products conditioned on its receipt of the proceeds. In a suit between the farmers' creditor and the purchaser's creditor (who claimed a security interest in the crops as inventory of the purchaser), the Washington Supreme Court relied in part on our decision in *Washington Sales,* and held the farmers' sales in violation of the creditor's conditional consent were unauthorized, continuing the

security interest in the collateral under Sec. 9-306(2) of the UCC. This same approach was used to allow recovery by the creditor in *In re Sunriver Farms, Inc.*, 27 Bankr. 655 (D. Bankr. Or. 1982) *aff'd in part, rev'd in part, sub. nom. Klein v. First Interstate Bank of Oregon*, 718 F.2d 1110 (9th Cir. 1983.) Other cases allowing recovery by the creditor under a variety of circumstances distinguishable from the case at bar include *In Re Ellsworth*, 722 F.2d 1448 (9th Cir. 1984); *Security Nat. Bank v. Belleville Livestock*, 619 F.2d 840 (10th Cir. 1979); *Farmers State Bank v. Edison Non-Stock Coop. Assn.*, 190 Neb. 789, 212 N.W.2d 625 (1973); *South Omaha Production Credit Assn. v. Tyson's Inc.*, 189 Neb. 702, 204 N.W.2d 806 (1973).

In contrast, given virtually identical circumstances regarding a creditor's conditional consent, a number of courts have denied recovery against purchasers of farm products after finding the consent terminated the creditor's security interest in the collateral. Perhaps the most extreme position is taken by the Idaho Supreme Court, which recently rejected the distinction between "conditional" authorization and any other type of authorization, and held that as between defendant, a third-party good faith purchaser for value which agreed to no condition, and the security holder which allowed the farm products to be placed on the market, the defendant had the superior right to the goods. *Western Idaho Product. Credit Ass'n v. Simplot Feed*, 106 Idaho 260, 678 P.2d 52 (1984). Other courts have not addressed the distinction between "conditional" or other authorization, but have denied recovery against a purchaser on the ground plaintiff creditor impliedly authorized sale. In *Lisbon Bank and Trust Company v. Murray*, 206 N.W. 2d 96, 99 (Iowa 1973), the court granted judgment to the purchaser, stating:

> "In the present case there is substantial evidence from which the trier of fact could find the bank gave general authority to Glenn Meier [the debtor] to sell collateral subject to his duty to account for the proceeds. The bank acknowledges no complaint would have been made here had the proceeds been applied against the note. The bank lost because it trusted Glenn Meier to do what he had done before when he sold collateral. Murray [the purchaser] trusted his assurance the sale was free of lien. As between the bank and Murray, the law imposes the risk of loss in these circumstances on the bank."

See also *Poteau State Bank v. Denwalt*, 597 P.2d 756 (Okla.1979).

In our opinion those cases are most persuasive which have

held that given a creditor's conditional consent to sale of collateral, the failure to meet the condition imposed does not prevent the consent from cutting off the security interest. In *First National Bank, Etc. v. Iowa Beef Processors*, 626 F.2d 764 (10th Cir. 1980), the creditor consented to sale of collateral in the debtor's own name "provided" seller remitted proceeds by its own check to the bank. After two sales from the debtor to IBP, the debtor filed for bankruptcy without remitting any of the proceeds to the bank. Regarding IBP's failure to check the public records before purchasing the cattle, the court said:

"IBP did not check to determine whether a security interest was involved and, if so, what the terms of the agreement were. We hold this failure is irrelevant here because the bank gave the debtors actual authority to sell; it was not necessary that this authority be communicated to the purchaser. [Citations omitted.] Even if IBP had checked, the bank presumably would have informed IBP that it had agreed to allow buyers to pay Wheatheart [the debtor] directly. Moreover, IBP could not have known at the time of the sale that Wheatheart would not remit the proceeds to the bank. [Citations omitted.]" 626 F.2d at 768-69.

The Court held that as to those sales on which defendant had made full payment to the debtor, there could be no recovery by the bank notwithstanding the conditional nature of its consent.

"Consent to sell in the debtor's own name 'provided' the seller remits by its own check to the bank is not a true conditional sales authorization. In essence, such a condition makes the buyer an insurer of acts beyond its control. The bank has made performance of the debtor's duty to remit proceeds to the bank a condition of releasing from liability a third party acting in good faith. IBP could not ascertain in advance whether this condition would be met, as it could if a condition precedent was involved; nor did IBP have any control over the performance of the condition, as long as it paid Wheatheart. A secured party has an interest in protecting its security by conditioning its consent, but it can place conditions that would afford it protection without great unfairness to the good faith purchaser.

"We conclude that the policy of the Uniform Commercial Code to promote ready exchange in the marketplace [citation omitted] outweighs the secured party's interest in the collateral under these circumstances. Therefore, we hold that even though the secured party conditions consent on receipt of the proceeds, failure of this condition will not prevent that consent from cutting off the security interest under section 9-306(2). [Citations omitted.]" 626 F.2d at 769.

See also *Anon, Inc. v. Farmers Production Credit,* _____ Ind.App. _____, 446 N.E.2d 656 (1983), where the court relied on *First National Bank v. Iowa Beef Processors, Inc.* and our decision in *Washington Sales* to bar recovery by the creditor on

the ground its consent to the sales on the condition the debtors remit the proceeds was a waiver of the right to require prior written authorization as specified in the security agreement. The court determined the loss resulting from the debtors' failure to pay should fall on the creditor, who could have prevented it.

The cases denying creditors recovery against purchasers where there has been an oral conditional consent to a sale of collateral are consistent with our holding in *Washington Sales.* In that case we held that consent will not be implied either from the provisions of a security agreement alone, or in combination with a creditor's passive acceptance of proceeds from prior sales; but a creditor's oral consent at the outset of a loan, permitting sales conditioned on remission of the proceeds, constitutes express consent terminating the security interest at the time of sale. Our decision in *Washington Sales* supports the trial court's summary judgment for defendant Excel Corporation in the present case. PNB gave Burkdoll oral permission to sell the cattle at the outset of the loan, notwithstanding the provision in the security agreement requiring prior written consent. PNB, having elected at the outset to allow its debtor to sell the collateral without complying with the security agreement, cannot now rely on that same agreement to hold the purchaser liable. The sales to Excel were clearly authorized dispositions within the terms of K.S.A. 84-9-306(2) which operated to relieve the purchaser from the security interest. Even if PNB had no particular knowledge of the specific sales to Excel at issue here, it did have knowledge of prior sales for which it received only a portion of the proceeds. The trial court found PNB had placed its trust in the debtor to apply the proceeds; Excel paid Burkdoll in full for the cattle, and it is not now responsible for the fact Burkdoll did not pay PNB.

The Court of Appeals in *Boese* based its decision upon our holding in *Washington Sales* and found it applied to third-party purchasers as well as to agents of the debtor. *North Cent. Kan. Prod. Cred. Ass'n v. Boese,* 2 Kan.App.2d 231, 235, 577 P.2d 824, *aff'd in unpublished opinion,* 225 Kan. clxix (1978).

Summary judgment is proper where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Lostutter v. Estate of Larkin,* 235

Kan. 154, 164, 679 P.2d 181 (1984). The trial judge rendered summary judgment in this case on uncontroverted facts which are not challenged on appeal. His interpretation and application of *Washington Sales* is consistent with *Boese* and that given the case by courts in other jurisdictions. The Tenth Circuit Court of Appeals decision in *First National Bank* represents the logical extension of *Washington Sales,* and both cases represent the better policy under the UCC. The loss in this case is properly borne by PNB, who allowed the collateral to enter the marketplace and entrusted the debtor to apply the proceeds.

The judgment is affirmed.

HERD, J., dissenting: I respectfully disagree with the majority opinion. Excel had constructive notice of the bank's security interest. There was no waiver of that lien. The conditional consent given Burkdoll to find a purchaser for the cattle made no change in the recorded security agreement. Thus, Excel was not misled. In fact the bank's recorded security interest was the reason it was free to permit the debtor to make the conditional sale. It was justified in relying on the recorded lien in case Burkdoll failed to deliver the sale proceeds.

This case is clearly distinguishable from *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co.,* 223 Kan. 689, 577 P.2d 35 (1978). In *Washington Sales* the sale company was the agent of the debtor and thus entitled to the benefit of the consent given by PCA. Excel is not the agent of Burkdoll. It is a third party to whom constructive notice is applicable.

This decision compounds agriculture's credit problems by forcing farm creditors to closely supervise each sale of farm products, thus rendering agricultural loans more expensive and less desirable. I would reverse the trial court's decision and hold Excel liable for the amount of the bank's unreleased recorded security interest.