(699 P.2d 1032)

No. 56,678

First National Bank and Trust Company of Oklahoma City, Oklahoma, *Appellee*, v. Atchison County Auction Company, Inc., Atchison, Kansas, *Appellant*.

Opinion filed May 2, 1985.

*Steve R. Fabert,* of Fisher, Patterson, Sayler & Smith, of Topeka, for the appellant.

*William Hergenreter,* of Shaw, Hergenreter & Quarnstrom, of Topeka, for the appellee.

Before FOTH, C.J., SWINEHART and BRISCOE, JJ.

SWINEHART, J.: Atchison County Auction Company (Atchison Auction) appeals from the judgment of the district court which found it liable to the First National Bank & Trust Company of Oklahoma City (Bank) for the proceeds from an unauthorized sale of seventy-five head of cattle covered by the Bank's perfected security interest.

In September 1981, Dr. Wilbur Hilst, a Topekan, sought financing for the purchase of 1,955 calves to expand his ranching operation. At the time he was negotiating a loan with the Oklahoma Bank, he owned approximately 780 head of cattle, a majority of which were purchased with loans from the First National Bank of Wamego and subject to its perfected security interest. One hundred seventy-eight head of the cattle were purchased from Jim and Russell Winsor on credit, and subject to their security interest which was unperfected at the time the Oklahoma Bank perfected its security interest.

The Oklahoma Bank inspected Hilst's holdings and agreed to grant Hilst a line of credit up to $950,000 for the purchase of the calves. In return they required Hilst sign a security agreement, a financing statement, and a loan agreement granting them a security interest in "all livestock . . . now owned or hereinafter acquired" by Hilst. The Oklahoma Bank paid the loans at the Wamego Bank, and its security interest was assigned to the Oklahoma Bank. The financing statement was properly filed with the Shawnee County Register of Deeds on September 28, 1981.

Shortly after the loan was consummated the Bank learned of the Winsor security interest with an outstanding debt of approximately $66,000. An agisters' lien of $16,000 had also been filed by the owners of the pasture in which these cattle were kept. Hilst was instructed by the Oklahoma Bank to clear up the liens on the Winsor cattle with funds other than those he had received from the Bank. The Winsor security interest was finally released in December 1981.

In April or May of 1982 the Oklahoma Bank learned that Hilst had sold seventy-five head of cattle at Atchison Auction on October 24, 1981. Hilst admitted to the Bank in writing that he sold the cattle without the knowledge of the Oklahoma Bank and without forwarding the proceeds of the sale to it.

The Oklahoma Bank then brought action against Atchison Auction, alleging conversion. The trial court found that the Oklahoma Bank had a valid security interest in the cattle, that it had not consented to the sale as required by the security agreement, and that Atchison Auction was liable to the Bank for $20,406.65 with interest at the rate of 10% per annum from October 24, 1981.

On appeal Atchison Auction contends the trial court erred in finding that the Oklahoma Bank had a perfected security interest in the seventy-five head of cattle sold, or, in the alternative, erred in concluding the security interest was not waived by the Oklahoma Bank's consent to the sale.

Initially, Atchison Auction contends that the Oklahoma Bank failed to prove that the cattle sold were cattle covered by the security agreement. The following description of the collateral is found in the security agreement:

"ALL LIVESTOCK, FEED, FEED GRAIN AND FEED COMMODITIES NOW OWNED OR HEREINAFTER ACQUIRED BY THE DEBTOR AND ALL WAREHOUSE RECEIPTS, BANKING ACCOUNTS, DEPOSITS, COMMODITY FUTURES CONTRACTS, MARGIN ACCOUNTS, DOCUMENTS OF TITLE, INSTRUMENTS, CONTRACT RIGHTS, ACCOUNTS RECEIVABLE, GENERAL INTANGIBLES AND OTHER TANGIBLE AND INTANGIBLE PERSONAL PROPERTY RELATING THERETO, ALL INSURANCE POLICIES AND PROCEEDS PAYABLE WITH RESPECT TO ANY OR ALL OF THE FOREGOING, TOGETHER WITH ALL PROCEEDS, PRODUCTS AND INCREASES THEREOF."

The security agreement further included the debtor's covenant that

"Said Goods are now in possession of Debtor, and are or when acquired by Debtor will be located at MAN RANCH; MAN RANCH; and WESTERN FEEDYARD, INC. in Shawnee; Wabaunsee; and Stanton County, State of Kansas." (See Appendix 1, copy of security agreement.)

The description in the financing statement echoes the security agreement description, but contains no reference to the location of the livestock.

Atchison Auction contends that the language of the security agreement covers only those cattle in the stated location, that Hilst had cattle in other counties, and that the Bank failed to show that these cattle were covered by the security agreement. The district court found that the security agreement granted the Bank a security interest in "all livestock" owned by Hilst and that the cattle sold were subject to the security agreement. We agree.

Two provisions of the Uniform Commercial Code speak to the sufficiency of a description of collateral in a security agreement or financing statement.

K.S.A. 84-9-110 provides:

"[F]or purposes of this article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

K.S.A. 84-9-402(1) further provides, in part:

"A statement of collateral in a financing statement is adequate if it generally identifies goods by one or more of the classifications listed in K.S.A. 84-9-109, or generally identifies other collateral by one or more of the following classifications: fixtures, documents, instruments, general intangibles, chattel paper or accounts. A statement of collateral in a financing statement shall not be deemed inadequate solely because it is broader than, or otherwise differs from, that found in the security agreement. A description of the location of the collateral is not necessary to an adequate statement except insofar as a description of location is specifically required by the uniform commercial code."

The Code does not require that a description of livestock include a description of the location of the collateral. Furthermore, we find that the word "livestock," one of the items included within the K.S.A. 84-9-109(3) definition of "farm products," reasonably identified the covered collateral and was sufficient to create a security interest in all livestock owned by Hilst.

The debtor's covenant to keep the collateral at a specific location is not part of the language granting the security interest,

but merely a promise on the part of the debtor to restrict the physical location of his livestock. As such it does not act as a limitation on the grant of the security interest. *Cf. In re Little Brick Shirthouse, Inc.*, 347 F.Supp. 827 (N.D. Ill. 1972).

Even if the covenant could be read as part of the language granting the security interest, a review of case law in other jurisdictions reveals that in a majority of cases where a description of the location of the collateral is not required by the code, inclusion of a location in the description does not limit the security interest unless the language of the agreement is unambiguous. See, *e.g., Matter of California Pump & Mfg. Co., Inc.*, 588 F.2d 717 (9th Cir. 1978); *Matter of Metzler*, 405 F. Supp. 622 (N.D. Ala. 1975); *In re Lee*, 14 Bankr. 804 (Bankr. E.D. Tenn. 1981); *Cf. First State Bank of Nora Springs v. Waychus*, 183 N.W.2d 728 (Iowa 1971).

Here there was ambiguity in the conflicting descriptions, and the trial judge correctly allowed parol evidence to determine the intent of the parties. The testimony of the parties unequivocally showed that the Bank was shown all of Hilst's cattle, including those kept in counties other than those listed when entering into the agreement, and that both parties clearly intended and understood that the security agreement would cover all of Hilst's livestock. Under these circumstances the intent of the parties governs, and the covenant of the debtor will not serve to limit the extent of the security interest. The trial court did not err in finding the cattle sold were owned by Hilst and subject to the Bank's security interest.

Alternatively, Atchison Auction argues that the Bank consented to the sale, waiving its security interest in the cattle in question. This argument, too, must fail.

The general rule of commercial law is that a buyer in the ordinary course of business takes free of a security interest created by his seller. K.S.A. 84-9-307(1). However an exception to the general rule occurs when the buyer is "a person buying farm products from a person engaged in farming operations." K.S.A. 84-9-307(1). Livestock is included within the definition of farm products, and the parties do not dispute that Hilst was a person engaged in farming operations. K.S.A. 84-9-109(3). This exception permits a secured creditor to reach collateral in the

hands of a good faith purchaser unless consent to the sale was given pursuant to K.S.A. 84-9-306(2), which provides:

"Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

Sale may be authorized by the secured party "in the security agreement or otherwise." K.S.A. 84-9-306(2). In *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co.*, 223 Kan. 689, 577 P.2d 35 (1978), the Kansas Supreme Court recognized that nothing in the Code prevents a secured party from attaching conditions or limitations to its consent to sale of collateral by a debtor, and that an unauthorized sale in violation of the conditions would not defeat the security interest. The security agreement in this case required written consent of the Bank before sale of the collateral. The loan agreement further provided that all checks from sale of the collateral be made payable solely to the Bank or jointly payable to Hilst and the Bank. Testimony showed that the Bank waived the requirement of written consent prior to sale, but required that Hilst discuss any proposed sale with them prior to the sale. Although the ultimate decision to sell rested with Hilst, oral consultation of the sale was required.

The record clearly reveals Hilst knew he had an obligation to consult with the Bank prior to any sale, and nothing in the record indicates the condition was ever waived. Furthermore, although Bill Berry, the Bank's loan officer, testified that Hilst should have known to forward a check made payable solely to him to the Bank to be applied on the loan, there was no evidence to indicate Hilst was authorized to have checks from cattle sales made solely to him.

The unauthorized sales in Manhattan on October 23 and in Atchison on October 24 were the first sales after the agreement with the Bank was signed, and in each instance Hilst failed to notify the Bank of the proposed sale and kept the proceeds. The Bank had no knowledge of the sales, and no course of dealing had been established between the parties to indicate the Bank approved and would accept proceeds checks made payable solely to Hilst. In fact, Hilst's own testimony reveals just the opposite:

"Q. Now, did Bill Berry ever tell you, Dr. Hilst, you can go to the sale barn or

anyplace and sell the collateral and have the check made payable to you only; did he ever tell you that?

"A. Not to my recollection.

"Q. Did he ever tell you that you could take the cattle you'd mortgaged to the bank, take them to a sale barn and sell them and keep the money?

"A. I can only think of one instance where this really came up, and that was at Christmas time when the ceiling on the loan limit had been reached and there was a question of whether that could be raised or not, and we had a bunch of stray cattle left that were too large to keep and needed to be sold, and I asked him if it was okay to sell them locally and pay some of the feed bills, and he said yes."

It is clear Hilst knew the condition had not been waived by the fact he later explicitly sought permission to have the condition waived for a specific purpose.

Finally, we cannot find that the Bank's instruction to Hilst to clear up the liens on the Winsor cattle constituted an explicit waiver of the conditions. Hilst was specifically instructed to clear up the liens with funds other than those connected with his Oklahoma Bank loan and, although several alternatives were discussed, the sale of cattle was not among them. Sufficient evidence supports the trial court's conclusion that the conditions to sale were neither explicitly nor implicitly waived in this case.

This case differs from those cases in which the court has found an explicit waiver of the condition. In *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co.,* evidence showed that a bank officer told the debtor that he could sell cattle providing he had the check made jointly or applied the proceeds to the loan. 223 Kan. at 697. A similar instruction was found to defeat the security interest in the recent case of *Peoples Nat'l Bank & Trust v. Excel Corp.,* 236 Kan. 687, 695 P.2d 444 (1985). Again in *North Cent. Kan. Prod. Cred. Ass'n v. Boese,* 2 Kan. App.2d 231, 577 P.2d 824 (1978), an instruction to mail or deliver a check for the proceeds was deemed tantamount to express consent that the debtor receive checks in his own name since he could not cash a jointly payable check. When the Production Credit Association later required that all checks be made jointly payable, the court concluded the security interest in the collateral was maintained. 2 Kan. App.2d at 234-35.

We cannot find that the trial court erred in concluding the conditions to sale were not waived, given the facts of this case. Therefore, the sales were unauthorized and the Bank's security interest in the cattle continued.

If Hilst was not authorized to sell the cattle, Atchison Auction, acting as his agent, also had no authority to sell the cattle. A livestock auctioneer who unauthorizedly sells property subject to a third party's security interest is liable in conversion to that third party even if the auctioneer has no knowledge of the security interest. *United States v. Burnette-Carter Co.*, 575 F.2d 587, 588 (6th Cir. 1978). The common-law rules of a factor's liability were reiterated by the Kansas Supreme Court in *DeVore v. McClure Livestock Commission Co., Inc.*, 207 Kan. 499, 503-04, 485 P.2d 1013 (1971), where the court said:

> "In analyzing the rights of the appealing parties, we start with the common law rule that a factor or commission merchant who receives property from his principal, sells it under the latter's instructions and pays him the proceeds of the sale, is guilty of a conversion if his principal had no title thereto or right to sell the property, and generally the factor may not escape liability to the true owner for the value of the property by asserting he acted in good faith and in ignorance of his principal's want of title (32 Am. Jur. 2d, Factors and Commission Merchants, § 45; 35 C.J.S., Factors, § 57b). The basis for the factor's liability if he assists in a conversion, even though innocent, is the fact he stands in the shoes of his principal (*Birmingham v. Rice Bros.*, 238 Iowa 410, 26 N.W.2d 39, 2 A.L.R.2d 1108, cert. den. 332 U.S. 768, 92 L.ed. 353, 68 S.Ct. 79, reh. den. 332 U.S. 820, 92 L.ed. 397, 68 S.Ct. 151)."

Under these common-law principles Atchison Auction stands in the shoes of Hilst. Since Hilst was unauthorized to sell the cattle, the auction company is liable for conversion of the proceeds from the sale.

The trial court is affirmed.

## SECURITY AGREEMENT

(Vehicles, ___ pment, Farm Equipment, Consumer Goods, Crops___ ivestock)

Name(s): Wilbur D. Hilst, M. D.

Address: 1271 Woodhull

City & State: Topeka, Kansas 66610

Hereinafter Called "Debtor", Whether One or More.

For valuable consideration, the receipt of which is hereby acknowledged, does hereby grant a Security Interest pursuant to the Uniform Commercial Code (Okla.) in and to the following described property to

THE FIRST NATIONAL BANK AND TRUST COMPANY OF OKLAHOMA CITY
120 N ROBINSON, P. O BOX 25189, OKLAHOMA CITY, OKLAHOMA 73125

Hereinafter Called "Bank"

INCLUDING ALL ACCESSIONS, ACCESSORIES, PARTS AND EQUIPMENT NOW OR HEREAFTER AFFIXED THERETO, AND ALL REPLACEMENTS, PRODUCTS AND PROCEEDS (WHICH TERM SHALL NOT BE CONSTRUED AS CONSENT BY BANK FOR SALE THEREOF), HEREINAFTER CALLED "GOODS", TO WIT.

ALL LIVESTOCK, FEED, FEED GRAIN AND FEED COMMODITIES NOW OWNED OR HEREAFTER ACQUIRED BY THE DEBTOR AND ALL WAREHOUSE RECEIPTS, BANKING ACCOUNTS, DEPOSITS, COMMODITY FUTURES CONTRACTS, MARGIN ACCOUNTS, DOCUMENTS OF TITLE, INSTRUMENTS, CONTRACT RIGHTS, ACCOUNTS RECEIVABLE, GENERAL INTANGIBLES AND OTHER TANGIBLE AND INTANGIBLE PERSONAL PROPERTY RELATING THERETO, ALL INSURANCE POLICIES AND PROCEEDS PAYABLE WITH RESPECT TO ANY OR ALL OF THE FOREGOING, TOGETHER WITH ALL PROCEEDS, PRODUCTS AND INCREASES THEREOF.

If crops or fixtures, the same are or will be grown on or affixed to following realty:

If livestock, the marks and brands described are holding marks and brands of Debtor and carry title although said livestock may have other marks and brands  As additional collateral, Debtor assigns, transfers and conveys to Bank o security interest in and to all feed, both hay and grain, owned by Debtor, all watering privileges, all wagons, horses, trucks, automobiles  camp outfits, saddle horses, all other equipment used in feeding and handling said livestock, and also Debtor's right, title and interest in all contracts and leases covering lands for pasture and grazing purposes

DEBTOR COVENANTS, WARRANTS AND AGREES THAT·

Debtor's legal residence and principal place of business (if engaged in business as a principal) are:

| LEGAL RESIDENCE | PRINCIPAL PLACE OF BUSINESS (Enter "None" if applicable) |
|---|---|
| Same, as above | Same as above |
| Topeka, Shawnee, Kansas | Topeka, Shawnee, Kansas |
| (City) (County) (State) | (City) (County) (State) |

Said Goods __are__ now in possession of Debtor, and are or when acquired by Debtor will be located at __MAN RANCH;__
(are) (are not)                                                                                       Shawnee; Wabaunsee;
__MAN RANCH; and WESTERN FEEDYARD, INC__ in and Stanton County,

State of __Kansas__ .

Said Goods are to be used by Debtor primarily in or for __business__
(business) (personal, family or household use) (farming operations)

Said Goods __are not__ affixed or to be affixed to realty, if so, that the same are or will be affixed to the realty hereinabove
(are) (are not)
so identified.

Said Goods, or some thereof, __will__ be acquired with the proceeds of one or more loans secured hereby.
(will) (will not)

THIS SECURITY INTEREST IS GIVEN TO SECURE THE PAYMENT OF· indebtedness in the principal amount of

----- NINE HUNDRED FIFTY THOUSAND AND NO/100 ----------.   ($ 950,000.00 )

as evidenced by promissory note(s) executed by the Debtor or by the Debtor and others and payable to the order of the Bank at such times and with such interest as are therein provided; all costs and expenses incurred in the collection thereof, including reasonable attorney fees, and in enforcing the Bank's rights hereunder, all extensions, renewals, substitutions and changes in form of the said note(s); all advances made by the Bank to protect the security hereof, including advances made for or on account of levies, insurance, repairs, taxes and the maintenance or recovery of the goods, any and all other indebtedness, liabilities and obligations of the Debtor (or any of them) to the Bank, whether now existing or hereafter arising, including all future loans and advances to the Debtor (or any of them); interest on any and all moneys expended or advanced by the Bank hereunder or pursuant hereto; and for performance of the covenants and agreements herein set forth and incorporated.

It is expressly stipulated by the parties that the security interest granted herein to secure the note or notes specifically named above is a first and prior security interest on the property herein described, and that securing all other indebtedness now or hereafter owing by Debtor to Bank is subordinate thereto

The rights and privileges of the Bank hereunder shall inure to the benefit of its successors and assigns. All covenants, representations, warranties, agreements and undertakings herein set forth and incorporated are joint and several if Debtor is more than one party and shall bind the heirs, executors, administrators, successors and assigns of the Debtor(s). If any provision hereof shall for any reason be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof.

THIS AGREEMENT INCLUDES THE ADDITIONAL PROVISIONS SET FORTH ON THE REVERSE SIDE HEREOF, THE SAME BEING INCORPORATED HEREIN BY REFERENCE.

_Wilbur D. Hilst, M.D._

Dated: __September 16__ , 19__81__
THE FIRST NATIONAL BANK & TRUST COMPANY
of Oklahoma City, Oklahoma

By_____
         Secured Party

DEBTOR(S)

DEBTOR FURTHER REPRESENTS, WARRANTS AND AGREES THAT:

The Debtor has, or from the proceeds of the indebtedness secured hereby will acquire, absolute title to the Goods free and clear of all liens, encumbrances, and security interests except the security interest hereby granted to the Bank and such other rights, if any, of Bank, and the Debtor warrants and will defend the same unto the Bank against the claims and demands of all persons and parties whomsoever;

Without the prior written consent of the Bank, the Debtor will not sell, exchange, lease or in any manner dispose of the Goods or any interest therein nor permit any lien, encumbrance or security interest to attach thereto except that created hereby. Without the prior written consent of the Bank, Debtor will not remove the Goods nor suffer the same to be removed from the County and State shown on the front hereof. Debtor will promptly notify the Bank of any change of the residence of the Debtor and of any change in the location of the Goods, whether such change occur with or without the Bank's consent. Debtor will permit the Bank to inspect the Goods at any time;

Debtor will use the utmost care to maintain the Goods in good condition and repair, but will not suffer any lien, charge or encumbrance to attach thereto, whether by reason of repairs, taxes, assessments or otherwise. Debtor will not use or permit the Goods to be used in violation of any law, statute or ordinance. If the market value of the Goods shall decline, except by virtue of ordinary wear and tear, Debtor will, upon demand of the Bank, either pay upon the indebtedness hereby secured a sum equal to such decline, or will, by an instrument of like tenor herewith mortgage and grant a security interest to the Bank in property of equal value to such decline, and upon failure to do so, the Bank may, at its option, accelerate and declare the indebtedness secured hereby to be immediately due and payable. Debtor will not, in any event, permit anything to be done that may impair the value of the goods or the security intended to be afforded by this Agreement.

Debtor will insure the goods with companies acceptable to Bank against such casualties and in such amounts as Bank shall require, all insurance policies shall be written for the benefit of Debtor and Bank as their interests may appear, and such policies or certificates evidencing the same shall be furnished to Bank. If Debtor fails to pay the premiums on any such insurance, Bank may do so for Debtor's account, adding the amount thereof to the other amounts secured hereby, however, Bank is under no obligation or has no duty to pay such premiums. Debtor hereby assigns to Bank any return or unearned premiums which may be due upon cancellation of any such policies for any reason whatsoever and directs the insurers to pay Bank any amount so due. Bank is hereby appointed Debtor's attorney in-fact to endorse any draft or check which may be payable to Debtor in order to collect such return or unearned premiums or the proceeds of such insurance; any balance of insurance proceeds remaining after payment in full of all amounts secured hereunder (including any cost of collection, attorney's fees or other costs actually incurred in connection herewith) shall be paid to Debtor, Bank may cancel any insurance on Goods, or any part thereof, after repossession.

If the Debtor shall fail to make any expenditure or pay any sum necessary to keep and maintain the Goods in good repair, to discharge any lien, encumbrance, levy, security interest or other charge upon the Goods, or to maintain insurance upon the Goods as required hereby, the Bank may, but shall not be required to make any expenditure for such purpose or purposes and all sums so expended shall be payable on demand, shall bear interest at the highest lawful rate and all such sums and interest are secured hereby.

Debtor will pay all costs of filing any financing, continuation or termination statements with respect to the Security Interest created by his agreement; Bank is hereby appointed Debtor's attorney-in-fact to do, at Bank's option and at Debtor's expense, all acts and things which Bank may deem necessary to perfect and continue perfected the Security Interest created by this Agreement and to protect the Goods;

If any representation or warranty of Debtor herein shall prove to be misleading or false or be breached; if Debtor shall fail to keep, observe, comply with and perform all of the obligations and undertakings herein set forth; if proceedings are instituted by or against Debtor or any other party to an obligation secured hereby under the Bankruptcy Act, as now or hereafter amended, or under any state insolvency law or statute for the relief of debtors, if any receiver, trustee, conservator, custodian, liquidator or other officer be appointed to take possession or control of any property of the Debtor; if the Debtor shall die, become insolvent or make any assignment for the benefit of creditors, or upon the institution by any party of action for attachment or similar process, or upon issuance of levy, execution or similar process against the Goods or any other property of Debtor or, if the Bank shall in good faith believe that the prospect of payment or performance is impaired; then, and in any such event, the Bank may, at its option and without notice to any party, declare all or any portion of the indebtedness secured hereby to be immediately due and payable and may proceed to enforce payment of the same, to exercise any or all rights and remedies provided herein and by the Uniform Commercial Code of the State of Oklahoma and by any other applicable law or statute. Whenever Debtor is in default hereunder, Debtor, upon demand by Bank, shall assemble the Goods and make them available to Bank at a place reasonably convenient to both parties. All remedies hereunder are cumulative, and any indulgence or waiver by Bank shall not be construed as an abandonment of any other right hereunder or of the power to enforce the same or another right at a later time.