788 P.2d 846

**Linda NEWGEN, Plaintiff–Appellant,**

**v.**

**OK LIVESTOCK EXCHANGE, an Idaho corporation, Defendant–Respondent.**

**No. 17272.**

Court of Appeals of Idaho.

Jan. 4, 1990.

Rehearing Denied March 14, 1990.

Alexanderson, Davis, Rainey, Whitney & Kerrick of Caldwell, Ronald P. Rainey (argued), for plaintiff-appellant.

Gigray, Miller & Downen of Caldwell, Scott E. Fouser (argued), for defendant-respondent.

SWANSTROM, Judge.

This appeal raises the question of whether the seller of a herd of dairy cows waived her perfected security interest by giving conditional authorization to the purchaser of the animals to cull unproductive cows from the herd. In a conversion action brought by the seller against the auction yard where the purchaser had disposed of several of the cows, the district court held the seller had waived her security interest. The district court granted summary judgment to the auction yard. The seller appeals. We vacate the summary judgment and remand for further proceedings.

The following facts are undisputed. In 1983 Linda Newgen and her former husband sold a herd of dairy cows to Lewis and Dolly Nunes pursuant to a "Sales Agreement." The agreement stated:

[A]s an integral part of this installment sale agreement Purchasers herein have executed a UCC form as well as a Loan and Security Agreement covering said cattle.

. . . .

Purchasers herein shall have cull privileges to remove nonproductive cows from said herd and must within five (5) days of removal replace such culls with productive cows. Purchasers shall at all times maintain the current herd size. Said replacement cows shall be subject to the UCC filings and the Loan and Security Agreement, and will in fact become replacement security on this contract.

At the same time, the Nunes executed a "Loan and Security Agreement" to give the Newgens a security interest in all of the cows, plus some of the offspring, and increases and replacements to the herd. The "Loan and Security Agreement" stated "the debtor [Nunes] will not sell or offer to sell or otherwise transfer the collateral or the proceeds thereof or any interest in either the collateral or proceeds without the prior written consent of the secured party [Newgen] having been obtained." The Newgens perfected their security interest by proper filings. Linda Newgen subsequently acquired her husband's interest and is now the sole party asserting the sellers' rights in this transaction.

Over the course of several months in 1984, the Nunes sold the entire herd of cows. The sales took place without the consent of Linda or her former husband. More than half of the herd was sold through a public livestock auction ring operated by OK Livestock Exchange. All the cows sold through OK Livestock were purchased for slaughter and not for dairy purposes. The proceeds from these sales, less sale commissions, were paid to the Nunes and were not transferred to Linda or used to replace the cows sold.

As noted, Linda Newgen brought this action against OK Livestock for conversion on the theory that OK Livestock was the agent of the Nunes in making an unauthorized sale of cattle in which Linda held a perfected security interest.

Under common law, the general rule is that an agent (auctioneer) is liable for conversion when he sells property on behalf of his principal who holds the property subject to a lien with no right to sell the property. The overwhelming majority of jurisdictions are in accord with this rule. *See* 7 AM.JUR.2D *Auctions and Auctioneers*, § 69 (1980); Annot., 96 A.L.R.2d 208 (1964).

*Commercial Bank at Alma v. Hales*, 281 Ark. 439, 665 S.W.2d 857, 858 (1984). *See also Colorado Bank and Trust Co. v. Western Slope Investments, Inc.*, 36 Colo. App. 149, 539 P.2d 501 (1975); *First National Bank and Trust Co. of Oklahoma City v. Atchison County Auction Co., Inc.*, 10 Kan.App.2d 382, 699 P.2d 1032 (1985) (review denied); *Michigan National Bank v. Michigan Livestock Exchange*, 432 Mich. 277, 439 N.W.2d 884 (1989); *Top Line Equipment Co. v. National Auction Service, Inc.*, 32 Wash.App. 685, 649 P.2d 165 (1982).

This common law rule has not been displaced by the UCC. A discussion of UCC 9–306, in 9 Anderson, Uniform Commercial Code, § 9–306:55 at 179, contains the following statement:

> When an auctioneer sells property in which a creditor has a perfected security interest without the permission of the creditor, the auctioneer is liable for conversion of the collateral even though he acted in good faith and without knowledge of the existence of the security interest. Such liability is a continuation of prior non-Code law and is not displaced by the fact that the Code contains no provision on the subject of the liability of third persons to the secured creditor.

A minority rule adopted in some states requires the auctioneer to have actual or constructive notice of the mortgagee's interest before liability is imposed on the auctioneer for conversion. *See Top Line Equipment Co. v. National Auction Service, Inc., supra.* We find no Idaho cases on this point. However, we note that here the auctioneer is deemed to have had knowledge of the Newgens' security interest in the cows because that security interest was perfected by proper UCC filings. It is also undisputed in the record at the present time that OK Livestock had actual knowledge of the security interest claimed by Linda Newgen. An affidavit by Linda's former husband states that he specifically

notified OK Livestock of the Newgens' security interest.

In support of its motion for summary judgment, OK Livestock argued that Linda had waived any security interest in the cattle because the sales agreement allowed the Nunes to sell "culls" from the herd. OK Livestock contended the cows sold through its auctions were specifically for beef, not dairy purposes, and therefore were culled nonproductive animals, which the Nunes could sell by the terms of the sales agreement. Linda countered this argument with affidavits showing the cows were not culled, nonproductive cows and that the Nunes lacked written permission to sell any of them, as required under the security agreement.

▮ The first question to be answered is whether the Nunes had authorization from the Newgens to sell all of the animals in the herd. Clearly, if the Nunes had such authorization, their agent OK Livestock could not be liable under a conversion theory merely for making the sales in behalf of the Nunes. For purposes of summary judgment the initial question must be answered "no." Undisputed affidavits of the Newgens and Mr. Nunes establish that the animals sold were not nonproductive dairy cows culled from the herd. Therefore, even if—as OK Livestock contends and as the district court found—written consent was given to sell nonproductive cows that consent cannot be construed to authorize sales of productive dairy cows. The district court did not—and for purposes of summary judgment could not—find that all of the animals sold were "culls." Ultimately, the district court concluded that because the Newgens had conditionally authorized the sale of some of the cows, they waived their security interest in all of them. We will examine this question under applicable provisions of the Idaho Uniform Commercial Code (UCC).

The applicable Idaho UCC provisions are contained in I.C. § 28-9-306(2):

> Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

The provisions in this section are qualified by an exception which is found in I.C. § 28-9-307(1). We will discuss the exception in more detail later. For now, our focus will be upon the language in § 28-9-306(2).

Under § 28-9-306(2), Linda Newgen's security interest in the cattle and in their proceeds continued notwithstanding the sale of the cows by the Nunes through OK Livestock's auction yard "unless the disposition *was authorized* by the secured party in the security agreement *or otherwise....*" (Emphasis added.) As noted earlier, the "Loan and Security Agreement" signed by the Nunes required them to get "prior written consent" before selling "any interest in ... the collateral." The contemporaneous "sale agreement" gave the Nunes "cull privileges" to remove nonproductive cows from the herd upon the condition that they be replaced with productive cows within five days. The district court, in granting summary judgment construed the sale agreement language to mean that it gave the Nunes permission to sell "cull" cows.

In reaching its conclusion, the district court initially considered only the "Sale Agreement" language. Newgen moved for reconsideration urging that the court was bound to construe the sale agreement language together with the language of the "Loan and Security Agreement" which required "prior written consent of the secured party" to any sale or transfer of the collateral. Newgen's motion was properly deemed to be a motion to alter or amend the judgment. I.R.C.R. 59(e). It was nevertheless denied when the district judge concluded that the "written consent" required by the security agreement was supplied by the "cull privileges" language in the sale agreement. Thus, the district court held that the Newgens had waived their security interest as to any cows sold by the Nunes.

It must be remembered that it was solely on the basis of the "cull privileges" language that the district court found there was a waiver of the security interest. Unlike most of the cases cited to us or which we have found, dealing with purported waivers under section 9–306(2), here there was absolutely no evidence of any prior conduct or course of dealing by the Newgens to indicate they were waiving the requirement of written consent. *Compare, e.g., Western Idaho Production Credit Association v. Simplot Feed Lots*, 106 Idaho 260, 678 P.2d 52 (1984).[1]

In construing the "cull privileges" language, the district court applied the *Ritchie* rule that enables a trial judge, who is sitting in a case where no jury trial has been requested and who is deciding a motion for summary judgment, to arrive at the most probable inferences to be drawn from uncontroverted facts. *Riverside Development Co. v. Ritchie*, 103 Idaho 515, 650 P.2d 657 (1982); *Blackmon v. Zufelt*, 108 Idaho 469, 700 P.2d 91 (Ct.App.1985). Applying this principle, the district court concluded that "cull privileges to remove nonproductive cows from said herd" could only mean that the Nunes could sell nonproductive cows upon the condition that they would replace such culls with productive animals within five days. The court further concluded that it would be unreasonable to impose upon purchasers of livestock at auction any duty to guarantee that the Nunes would replace the culled cows with productive ones within five days of the sale. We agree with this second conclusion but not with the first one.

■ First, we question whether the *Ritchie* rule is of any help in determining the

meaning to be given the "cull privileges" language. If the language of the documents is not ambiguous then the meaning of that language is to be determined as a matter of law from the instruments themselves without resort to inferences drawn from extraneous facts.

The interpretation of written contracts ... presents, in the first instance, a question of law for the courts. [Citations omitted.] However, if an agreement is ambiguous, the resolution of any ambiguity raises a question of fact for the trial court or jury. [Citations omitted.] While the trial judge's decision on the ambiguity question is entitled to deference, it is subject to our independent free review. *Clearwater Minerals Corp. v. Presnell*, 111 Idaho 945, 729 P.2d 420 (1986).

*St. Clair v. Krueger*, 115 Idaho 702, 704–05, 769 P.2d 579, 581–82 (1989). Here, the district court held that the language is not ambiguous. We agree. However, we believe that certain rules of construction must be applied to determine the meaning to be given the language in this instance. Clearly, the sales agreement, executed at the same time as the security agreement and making reference to it, must be construed with the security agreement to determine the meaning of the parties' entire agreement. *Charpentier v. Welch*, 74 Idaho 242, 259 P.2d 814 (1953); *Deer Creek, Inc. v. Clarendon Hot Springs Ranch*, 107 Idaho 286, 688 P.2d 1191 (Ct.App.1984) (review denied).

■ In construing the language of the two instruments the district judge held that the "cull privileges" language in the sale

---

1. The UCC does not prevent a secured party from attaching a condition or limitation to its consent to sales of collateral by a debtor. *Southwest Washington Production Credit Association v. Seattle–First National Bank*, 92 Wash.2d 30, 593 P.2d 167 (1979); *Peoples National Bank and Trust v. Excel Corporation*, 236 Kan. 687, 695 P.2d 444 (1985). *See also* Annot. *What Constitutes Secured Party's Authorization To Transfer Collateral Free of Lien Under UCC § 9–306(2)*, 37 A.L.R.4th 787 (1985).

Admittedly, there is dicta in *Western Idaho Production Credit Association v. Simplot Feed Lots*, 106 Idaho 260, 678 P.2d 52 (1984) (WIP-

CA), which seemingly rejects the distinction between "conditional" authorization and any other type of authorization. However, the "condition" that the secured party imposed in *WIPCA* was not one that any court would ordinarily uphold. "Consent to sell in the debtor's own name 'provided' the seller remits by its own check to the bank is not a true conditional sales authorization." *First National Bank and Trust Company of Oklahoma v. Iowa Beef Processors, Inc.*, 626 F.2d 764, 769 (10th Cir.1980). The actual holding in *WIPCA* was entirely consistent with decisions in similar cases but the case does not control the issues presented here.

agreement supplied the "written consent" to sell requirement of the security agreement. He held, in effect, that the right *to remove* nonproductive cows reasonably implied the right *to sell* those cows. Thus, "prior written consent" to a sale was given by the sale agreement and no other specific consent was required. For reasons not clearly apparent in the record, the judge also concluded that by giving such consent the Newgens waived their security interest. We respectfully disagree.

The security agreement is clear as to the requirement of written consent to sell. On the other hand, no language is contained in the sale agreement giving the Nunes the right *to sell* culled cows *without* written consent. No language even suggests that culled cows may be disposed of without regard to the Newgens' security interest. A waiver of a security interest should not be inferred from words which recite only that purchasers may "remove nonproductive cows from [the] herd."

The Colorado Court of Appeals had this to say about waiver of a security interest:

Waiver is the voluntary abandonment or surrender by competent persons of a right known by them to exist, with the intent that such right shall be surrendered and such persons be forever deprived of its benefits. *Transamerica Corp. v. Merrion*, 127 Colo. 100, 255 P.2d 391; *People ex rel. Metzger v. Watrous*, 121 Colo. 282, 215 P.2d 344. For a waiver "there must be a clear, unequivocal, and decisive act of the party showing such a purpose." *Hall v. Beymer*, 22 Colo.App. 271, 125 P. 561. There was no such act here. *Cf. Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726.

*Colorado Bank & Trust Co. v. Western Slope Investments, Inc.*, 539 P.2d 501, 503 (1975). This statement is in accord with the general view that waiver is not to be presumed. To establish a waiver, the intention to waive must clearly appear. *Riverside Development Co. v. Ritchie, supra; Seaport Citizens Bank v. Dippel*, 112 Idaho 736, 735 P.2d 1047 (Ct.App.1987).

From the language in the sales agreement giving the Nunes the right to "remove unproductive cows from the herd" the district court not only inferred authorization *to sell*, but also inferred a right to disregard the Newgens' security interest in those cows.

We believe that only one reasonable meaning can be given the "cull privileges" language, when read in conjunction with the "prior written consent" language of the security agreement: Before any culled cows are sold the Nunes must obtain specific written permission for their sale. This meaning is more consistent with terms of the security agreement which are clearly intended to guard against implied waivers. For example, the security agreement's description of the "Collateral" included the following:

3.7 Proceeds and products of each and every item of the collateral above described; but the provisions of this subsection 3.7 shall not be construed to mean that the secured party consents to any sale or disposition of any part of the collateral except as permitted by the express terms of this agreement.

Moreover, even if the right to sell nonproductive dairy cows is implied by the sale agreement, there is no need to also imply an intended waiver of the Newgens' security interest in all of the cows and in all of the proceeds. No language in the sale agreement suggests the Newgens' security interest in any of the cattle may be disregarded. Neither does the UCC require such a result.

For example, the last sentence of I.C. § 28-9-402(7) says:

A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

*In re Matto's Inc. v. Olde Colonie Place*, 8 B.R. 485 (Bankr.E.D.Mich.1981), the court was concerned about giving effect to this language in the code. The court noted that, to the extent possible, every clause and word of a statute should be given effect. Thus, the court in *Matto's* held there was a

need to reconcile this sentence of 9–402(7) with the language of 9–306(2) which provides that "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the desposition was authorized by the secured party in the security agreement *or otherwise....*" (Emphasis added).

To effect a reconciliation of section 9–402(7) with section 306(2), particularly in cases where the security agreement prohibits the debtor from transferring the encumbered collateral without the written consent of the secured creditor, the term, "otherwise," is not satisfied by any form of consent which does not clearly and unambiguously authorize disposition of the collateral free of the security interest.

8 B.R. at 489. A similar result was reached in *Central Equipment v. Dolk Tractor,* 144 Cal.Rptr. 367, 78 Cal.App.3d 855 (1978) without considering the impact of section 9–402(7).

We conclude that the "cull privileges" language should not be interpreted to supply the "prior written consent" to sell required by the security agreement. We hold that the district court erred in determining that the Newgens waived their security interest by authorizing the sale of culled cows. No such authorization should be inferred from the language of the sale agreement. Accordingly, under I.C. § 28–9–306(2) Newgen had a valid security interest in the cows sold by the Nunes through OK Livestock.

Having decided that the sales of the cows by the Nunes through OK Livestock were not "authorized by the secured party in the security agreement or otherwise," I.C. § 28–9–306(2), we must now consider

whether section 28–9–307(1) offers any defense to OK Livestock in this case. This section states:

A buyer in ordinary course of business (subsection (9) of section 28–1–201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

No meaningful argument is made by OK Livestock to explain how it has the benefit of this exception to section 28–9–306(2) other than to question whether the cows— once in possession of OK Livestock—could be classified as "farm products" rather than "inventory." *See* I.C. § 28–9–109(3) and official comments thereto. Our research discloses cases going each way. Recent legislative changes extending protection of section 28–9–307 to commission merchants or selling agents marketing "farm products" is not indicative that under the former law the cows in this case would have been classified as "inventory" when in the possession of OK Livestock. However, we do not need to decide this question.

■ It is clear that an auctioneer is not a "buyer" who has the protection of section 28–9–307(1).[2]

"Buying" does not include a transaction in which the person claiming to be a "buyer in the ordinary course of business" merely acts as an agent for another, *such as an auctioneer.* See Annot. 87 A.L.R.3d 11 (1978). An auctioneer is merely a selling agent and cannot claim the protection given to buyers of farm products in the ordinary course of business. [Emphasis original.]

**2.** We are aware that the Idaho Legislature amended I.C. § 28–9–307 effective July 1, 1986, to provide that "a commission merchant or selling agent who in the ordinary course of business sells farm products for a person engaged in farming operations" can have the benefit of the exception under certain prescribed conditions. Comprehensive changes in UCC filing and registration requirements were made at the same time. 1986 Idaho Sess. Laws, ch. 338, pp. 834–44. Extensive clarifying changes were enacted

the following year. 1987 Idaho Sess. Laws, ch. 284, pp. 596–605. Because of these changes, our decision in this case will have little effect in future cases involving sales of "farm products" through auction yards.

We also recognize that these current statutes reflect a public policy change in expanding the scope and nature of protection for persons involved in the sale and financing of farm products. These policy changes, however, give us no reason to reach a different result in this case.

*Commercial Bank at Alma v. Hales,* 281 Ark. 439, 665 S.W.2d 857, 859 (1984). *See also First National Bank of Amarillo v. Southwestern Livestock, Inc.,* 616 F.Supp. 1515 (D.C.Kan.1985) *aff'd* 859 F.2d 847 (10th Cir.1988).

In *First National Bank of Amarillo,* the auctioneer argued that even if it did not qualify as a buyer, as the debtor's agent it was not liable for conversion because the ultimate buyer for value acquired the cattle (collateral) free of plaintiff's security interest. The court rejected this argument, observing that the critical factor is the debtor's authorization to sell, not the validity of the title acquired by the ultimate buyer. A similar argument was rejected in *Michigan National Bank v. Michigan Livestock Exchange,* 432 Mich. 277, 439 N.W.2d 884 (1989).

We conclude here that I.C. § 28–9–307(1) does not insulate OK Livestock from liability. Accordingly, we vacate the district court's summary judgment order and remand the case for further proceedings consistent with this opinion.

Costs to appellant, Linda Newgen. No attorney fees awarded.

WALTERS, C.J., concurs.

BURNETT, Judge, specially concurring.

The lead opinion declares the common law rule that an auctioneer may be liable for selling property on behalf of a principal whose interest in the property is subject to a lien and who has no right to sell the property without the lienholder's consent. This declaration would seem to frame a straightforward issue—did the principal in this case (Nunes) have a right to sell the cows without consent of the lienholder (Newgen)? The liability of the auctioneer (OK Livestock) turns on that question.

The lead opinion does not answer the question directly. Rather, it suggests a distinction between authority to remove cows from a dairy herd and authority to sell them. It then discusses the ancillary question of whether authority to sell, if it did exist, would have the secondary effect of waiving the lienholder's security interest. The opinion holds that the security interest was not waived in the present case and—upon this ancillary predicate—it concludes that Nunes lacked authority to sell the cows without consent.

With due respect to my colleagues, I believe the issue can be decided by a more straightforward analysis. The contract between Newgen and Nunes consists of three documents. First, there is a "Sales Agreement" prepared with specific reference to this transaction. Second, there is a boiler plate form of "Loan and Security Agreement" containing blank spaces for information pertaining to the transaction. Third, there is a UCC–1 form used to perfect the security interest. The "Loan and Security Agreement" contains a boiler plate provision requiring Nunes to obtain written consent from Newgen before re-selling any collateral. However, the "Sales Agreement" specifically gives Nunes "cull privileges to remove non-productive cows from said herd. . . ." The "Sales Agreement" goes on to say that Nunes is required to replace any cows thus removed and that the new cows will become replacement collateral under the "Loan and Security Agreement."

When interpreting a contract, our duty is to give reasonable meaning to all of the provisions—avoiding, if possible, the treatment of any provision as mere surplusage. Here, the construction which gives meaning to all parts of the contract is one which recognizes that the "culling privilege" contained in the "Sales Agreement" embodies a specific exception to the general requirement of prior written consent as set forth in the boiler plate "Loan and Security Agreement." Indeed, failure to recognize such an exception would reduce the "culling privilege" to mere surplusage. Although the lead opinion draws a distinction between authority to remove cows from the herd and authority to sell them, I think the distinction is artificial. The only reason for culling an unproductive cow from a dairy herd is to sell it and replace it with a productive cow.

Accordingly, I deem it clear that Nunes had narrow authority to sell in connection with the culling process, but a sale for any

other purpose could not be made without Newgen's consent. Thus, the question is narrowed to whether Nunes was engaged in "culling" when he sold the cattle in question. On this point, there is no genuine issue of material fact. Nunes' own affidavits make it clear that none of the cows was sold and replaced in a culling process. Rather, the herd was simply liquidated to raise money during a period of financial distress. These affidavits are uncontradicted.

Therefore, I would hold that the sale of the cows did not come within the "culling privilege" exception to the general requirement of written consent. The sale at auction was without authorization, subjecting Nunes to liability (an academic point in light of his bankruptcy), and subjecting OK Livestock to liability under the common law rule declared in the lead opinion.